## EXCLUSIVE PATENT LICENSE AGREEMENT

This Agreement ("**Agreement**") is made as of the 18th day of July, 2017 ("**Effective Date**"), by and between Schawbel Technologies LLC., a Massachusetts limited liability company, with a principal place of business at 2400 District Avenue, Burlington, Massachusetts ("**Licensor**") and Heat Factory, USA, LLC. ("**Licensee**"), a Nevada corporation with a principal place of business at 1958 Kellogg Ave., Carlsbad, CA 92008, each referred to herein individually as a "**Party**" and collectively as the "**Parties**".

### RECITALS

Licensor is in the business of manufacturing, marketing, distributing and selling those heating products set forth in **Appendix A** ("**Heating Products**").

Licensor and Licensee have entered into an Asset Purchase Agreement of even date ("**Asset Purchase Agreement**") providing for, among other things, the sale by Licensor to Licensee all of Licensor's finished Heating Products in inventory ("**Inventory**").

Licensee intends to resale the Inventory under Licensor's brand name ThermaCELL.

Licensor is the owner of certain patents, technological information, and general know-how used in the manufacturing of the Heating Products.

In addition to the resell of the Inventory, Licensee desires to manufacture, distribute, and sell new Heating Products under its own brand name. To that end Licensee desires to license certain patents, technological information, and general know-how from Licensor in exchange for royalty payments on the terms and conditions set forth in this Agreement. Licensor desires to grant such a license to Licensee.

Licensee has the capability to commercially manufacture, or have manufactured, distribute and sell the Heating Products and accordingly desires to license Licensor's patent rights, technological information, and general know-how.

Accordingly, for good and valuable consideration, the sufficiency of which is acknowledged, the Parties agree as follows:

### 1. DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings, unless the context unequivocally requires otherwise.

1.1     "**Agreement**" has the meaning set forth in the introductory paragraph.

1.2     "**Affiliate**" with respect to either Party shall mean any corporation or other legal entity other than that Party in whatever country organized, controlling, controlled by or under common control with that Party. The term "control" shall mean (i) in the case of Licensee, direct or indirect ownership by Licensee or a relative of Licensee of fifty percent (50%) or more of the voting securities or membership interests having the right to elect directors or otherwise direct management and policies, and (ii) in the case of Licensor, the power, direct or indirect, to elect or appoint fifty percent (50%) or more of the directors or trustees, or to cause direction of management and policies, whether through the ownership of voting securities, by contract or otherwise.

1.3     "**APA Nonpayment**" has the meaning set forth in Section 9.4.

1.4     "**Applicable Due Date**" has the meaning set forth in Section 3.4.

1.5     "**Asset Purchase Agreement**" means the Asset Purchase Agreement between Licensor and Licensee of even date.

1.6     "**Certifications**" refer to those certifications identified on **Appendix B**.



1.7    "**Claim**" shall mean any pending or issued claim of any Patent that has not been permanently revoked, nor held unenforceable or invalid by a decision of a court or other governmental agency of competent jurisdiction that is unappealable or unappealed in the time allowed for appeal.

1.8    "**Defense Notice**" has the meaning set forth in Section 6.1.

1.9    "**Effective Date**" has the meaning set forth in the introductory paragraph.

1.10    "**Financing Capacity**" has the meaning set forth in Section 2.4(a).

1.11    "**General Know-How**" means Licensor's customer list, and unpatented technical information relating to Licensor's development, manufacturing, processing and quality control of the Heating Products and the Patents Rights, including without limitation know how, manuals, specifications, procedures, flow charts, apparatus plans, and any other information or documentation communicated as a result of Licensor's imparting directly to, or giving Licensee access to, the same. Notwithstanding the foregoing, General Know-How expressly excludes any Technological Information or Patent Rights.

1.12    "**Governmental Authority**" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, Canada, or any state, county, city, province or other political subdivision or similar governing entity where the Products are sold.

1.13    "**Heated Insole**" shall mean any heated, battery-operated, insole, other than the Products, that is manufactured, distributed, marketed, or sold by Licensee.

1.14    "**Heating Products**" has the meaning set forth in the recitals.

1.15    "**Improvements**" means all developments Licensee may make regarding or related to the Patent Rights, Technological Information, General Know-How, Products, and/or Process prior to the termination of this Agreement, whether or not patentable.

1.16    "**Infringement Claims**" has the meaning set forth in Section 6.1.

1.17    "**Initial Payment Date**" has the meaning set forth in Section 2.5.

1.18    "**Inventory**" has the meaning set forth in the recitals.

1.19    "**Laws**" or "**Law**" means all laws, statutes, rules, regulations and ordinances, and any other pronouncements having the effect of law, of any Governmental Authority.

1.20    "**Judgment of Infringement**" has the meaning set forth in Section 3.1(e).

1.21    "**Legal Expenses**" has the meaning set forth in Section 6.2.

1.22    "**License Territory**" shall mean the United States of America and Canada provided, however, that in the event there is no existing, uncured, Payment Default as of December 31, 2017, the License Territory shall expand to include all of the World.

1.23    "**Licensee**" has the meaning set forth in the introductory paragraph.

1.24    "**Licensee's Indemnitees**" has the meaning set forth in Section 7.1(b).

1.25    "**Licensee's Insurance**" has the meaning set forth in Section 7.2(a).

1.26    "**Licensor**" has the meaning set forth in the introductory paragraph.

1.27    "**Licensor's Indemnitees**" has the meaning set forth in Section 7.1(a).

1.28    "**Net Sales**" shall be calculated as set forth in this Section 1.26.

   (a)    Subject to the conditions set forth below, "Net Sales" shall mean:

      (i)    the gross amount billed or invoiced to the customer, or if no such bill or invoice is issued the amount of consideration received, whichever is greatest, by

2



Licensee and its Affiliates for or on account of Sales of Products, Inventory, or Heated Insoles in a given Reporting Period;

(ii) less the following amounts, to the extent identified or separately stated on a bill or invoice, or subsequent invoice, or if not separately invoiced, on a pro rata dollar for dollar basis actually paid, credited, reduced, or otherwise incurred by Licensee and its Affiliates in effecting such Sales in that given Reporting Period:

(A) amounts repaid or credited by reason of rejection, refund, or return of the Products or Heated Insoles;

(B) allowances for damaged, obsolete, and defective goods;

(C) customary trade and quantity discounts to the extent allowed and taken, including but not limited to promotional coupons, rebates, consumer or trade discount incentives;

(D) amounts for freight charges or freight absorption, insurance, handling and shipping charges applicable to the Products or Heated Insoles;

(E) any and all taxes, customs duties and other governmental charges levied on or measured by Sales, transportation or delivery of Products or Heated Insoles, whether paid by or on behalf of Licensee so long as Licensee's price is reduced thereby, but not franchise or income taxes of any kind whatsoever; and

(F) if any of the deduction amounts set forth in Section 1.9(a)(ii) are incurred by Licensee after the Reporting Period in which the Net Sale is reported, Licensee may later report such amounts and take the deductions in a subsequent Reporting Period.

(b) Specifically excluded from the definition of "Net Sales" are amounts attributable to any Sale of any Product or Heated Insole between or among Licensee and any Licensee Affiliate, and any use or sale of the Inventory prior to January 1, 2018.

(c) No deductions shall be made for any commissions paid to any individuals.

(d) Net Sales shall be deemed to have occurred and the applicable Product or Heated Insole "Sold" on the earlier of: 1) the date payment is received for the Sold Product or Heated Insole; or 2) the due date for full payment of the Sold Product or Heated Insole. In the event that more than one payment is made for a Sold Product or Heated Insole, each such partial payment made before the due date for full payment shall be deemed a separate Sale for purposes of calculating Net Sale in accordance with the preceding sentence.

(e) No item of Inventory shall be Sold at a price that is lower than eighty percent (80%) of the item's value , as reflected on Schedule A-1 of the Asset Purchase Agreement, or for non-cash consideration (whether or not at a discount) without the prior written consent of Licensor, which consent shall not be unreasonably withheld. Without such prior written consent of Licensor, for purposes of calculating Net Sales the gross amount billed or invoiced for that item shall be deemed to be eighty percent (80%) of the item's value, as reflected on Schedule A-1 of the Asset Purchase Agreement.

1.29 **"Notice of Intent Not to Prosecute"** has the meaning set forth in Section 5.1.

1.30 **"Notice of Sale"** has the meaning set forth in Section 2.4(a).

1.31 **Notice of Termination of Infringement Claims** has the meaning set forth in Section 6.1.

1.32 **"Offered Patent Rights"** has the meaning set forth in Section 2.4(a).



1.33    **"Over Due Payment"** has the meaning set forth in Section 3.4.

1.34    **"Party"** has the meaning set forth in the introductory paragraph.

1.35    **"Parties"** has the meaning set forth in the introductory paragraph.

1.36    **"Patents"** has the meaning set forth in Section 1.35.

1.37    **"Patent Rights"** shall mean the U.S. Patents and U.S. Patent Applications or the equivalent of applications, including any division, continuation (including continuation-in-part) or any foreign patent application or Letters Patent or the equivalent thereof issuing thereon or reissue, reexamination or extension thereof, as identified in **Appendix C** ("**Patents**"), and any patents or applications currently owned or later owned by Licensor related to the Products or Process.

1.38    **"Payment Default"** has the meaning set forth in Section 9.4.

1.39    **"Payment Default Notice"** has the meaning set forth in Section 9.4.

1.40    **"Person"** means any natural person, corporation, general partnership, limited partnership, limited liability company, proprietorship, other business organization, trust, union, association or Governmental Authority.

1.41    **"Process"** shall mean any process, method or service the use or performance of which, in whole or in part:

        (a)    absent the license granted hereunder would infringe, or is covered by, one or more Claims of the Patents; or

        (b)    employs, is based upon or is derived from Technological Information or General Know-How.

1.42    **"Product"** shall mean any tangible property, article, device or composition, the manufacture, use, or sale of which, in whole or in part:

        (a)    absent the license granted hereunder would infringe, or is covered by, one or more Claims of the Patents; or

        (b)    employs, is based upon or is derived from Technological Information or General Know-How.

1.43    **"Proposed Third Party Sale"** has the meaning set forth in Section 2.4.

1.44    **"Related Person"**  means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, financial advisors, Representatives, attorneys, accountants, investment bankers, Affiliates or Representatives of (i) any such Person or (ii) any Affiliate of such Person.

1.45    **"Reporting Period"** shall mean each month commencing on January 1, 2018. For clarification, the first Reporting Period shall commence on January 1, 2018 and end on January 31, 2018.

1.46    **"ROFR"** has the meaning set forth in Section 2.4.

1.47    **"Royalties"** has the meaning set forth in Section 3.1.

1.48    **"Sales Report"** has the meaning set forth in Section 4.2.

1.49    **"Sell"** (and **"Sale"** and **"Sold"** as the case may be) shall mean to sell or have sold, to lease or have leased, to import or have imported or otherwise to transfer or have transferred a Product, Inventory, or Heated Insole from Licensee or and Affiliate of Licensee to a third party in exchange for valuable consideration paid to Licensee or its Affiliate, in the form of cash or otherwise.



1.50 **"Technological Information"** shall mean the following items owned by Licensor as of the Effective Date:

    1.50.1  Bill of materials for the Heating Products;

    1.50.2  Testing software for the Heating Products;

    1,50.3  Drawings and designs related to the manufacturing of the Heating Products;

    1.50.4  Heating Product related proprietary software and firmware;

    1.50.5  Testing quality and durability processes for the Heating Products;

    1.50.6  Bluetooth software application applicable to the Heating Products; and

    1.50.7  Heating Product certifications and registrations.

1.51 **"Term"** has the meaning set forth in Section 9.1.

1.52 **"Transitional Services"** has the meaning set forth in Section 2.5.

## 2. LICENSE

2.1 <u>Grant of License</u>.

    (a)    Subject to the terms of this Agreement Licensor hereby grants to Licensee for the License Territory:

        (i)    an exclusive, royalty-bearing license of the Patent Rights to make, have made, use, have used, Sell and have Sold, Products; and

        (ii)    the exclusive royalty-free right to use Technological Information and General Know-How disclosed by Licensor to Licensee hereunder in accordance with this Agreement, provided, however, that such right shall be non-exclusive in relation to (y) any third party purchaser of Patent Rights pursuant to Section 2.4, and (z) any use of Technological Information and General Know-How unrelated to Heating Products and/or the Patent Rights.

    (b)    <u>Scope of License</u>. The license granted in Section 2.1(a) includes, but is not limited to, licenses to:

        (i)    the right to grant to any customer, user or consumer of Products the right to use, lease, and resell such purchased Products or Process in a method coming within the scope of Patent Rights;

        (ii)    the right to grant a reseller of Licensee the right to Sell (but not to make, have made, use or have used) such Products for or on behalf of Licensee in a manner consistent with this Agreement;

        (iii)    make, have made, use, export and import machines, tools, materials and other instrumentalities, insofar as such machines, tools, materials and other instrumentalities are involved in, incidental to or otherwise desirable for the development, manufacture, testing or repair of Products or Processes which are or have been made, used, leased, owned, sold, exported or imported by the Licensor;

        (iv)    combine and/or bundle such Products (as sold or leased) with any other product; and

        (v)    utilize a method or process involving the use of a Product or Process to manufacture (including associated testing) any other product.



2.2     No Retained Rights.  Subject to the terms and conditions of this Agreement, including but not limited to Section 11.1 (Covenant not to Compete), any and all licenses granted hereunder are subject to the right of Licensor and its Affiliates to use and rely on and make use of the Patent Rights, Technological Information and General Know How in any manner Licensor should elect other than to grant another license thereof.

2.3     No Additional Rights.  It is understood that nothing in this Agreement shall be construed to grant Licensee or any of its Affiliates a license, express or implied, under any patent owned solely or jointly by Licensor other than of the Patent Rights, Technological Information, and General Know-How expressly licensed in this Agreement.

2.4     Right of First Refusal.  In the event that Licensor enters into an agreement with a third party, including an Affiliate of Licensor, the effect of which is to transfer ownership or control of the Patent Rights, whether through an outright sale of the Patent Rights, assignment of this Agreement, or a change in control of Licensor through stock sale (of 50% or more of stock), merger, or acquisition (a "**Proposed Third Party Sale**"), Licensee shall have the right, subject to the terms of this Section 2. 4, to acquire the Patent Rights being sold on the same terms and conditions as the Proposed Third Party Sale (the "**ROFR**").

   (a)     Licensor shall promptly give Licensee written notice ("**Notice of Sale**") of the terms and conditions of the Proposed Third Party Sale; which Patent Rights (if less than all) are being sold ("**Offered Patent Rights**"); the purchase price; and terms of payment. Licensee shall have twenty four (24) business days from the date of the Notice of Sale to inform Licensor in writing of its election to match the terms and conditions, including without limitation price, of the Proposed Third Party Sale, and to provide reasonable evidence of Licensee's capacity to pay whatever consideration is provided for in the Proposed Third Party Sale ("**Financing Capacity**").  Should Licensee timely make such election and demonstrate its Financing Capacity, then Licensor shall sell the Offered Patent Rights to Licensee pursuant to the terms and conditions of the Proposed Third Party Sale, and such sale shall close no later than thirty (30) days following the date of Licensee's election to match the Proposed Third Party Sale. Failure by to close the within such thirty (30) period shall terminate Licensee's right of first refusal, unless the delay is caused by Licensor.

   (b)     In the event that Licensee fails to exercise its right of first refusal as provided in this Section 2.4(a), then, Licensor may sell the Offered Patent Rights to the proposed purchaser on the terms set forth in the Notice of Sale. The Licensor may not, however, sell to any other person or entity, or at any other price or on any other terms and conditions, than those specified in the original Notice of Sale, without giving a new Notice of Sale in accordance with Section 2.4(a) and allowing Licensee a first right of refusal to the changed terms.

   (c)     Any third party purchaser of the Offered Patent Rights shall take the Offered Patent Rights subject to the licenses provided in this Agreement, and shall be bound by the terms set forth in this Agreement.

2.5     Transitional Services.  Licensor shall provide to Licensee certain research and development consulting services identified in **Schedule 2.5** (the "**Transitional Services**") to assist Licensee with its manufacturing, marketing and sale of Products and Process.  Licensor shall provide all the Transitional Services on or before August 31, 2017. For the Transitional Services, Licensee shall pay to Licensor $500,000, payable in three (3) installments, the first of which in the amount of $125,000 shall be paid on



or before the tenth (10th) day following the Closing Date (the "**Initial Payment Date**"), the second installment, in the amount of $187,500, shall be paid on or before September 1, 2017, and the third installment, in the amount of $187,500, shall be paid on or before October 1, 2017. Licensor shall provide the Transitional Services in its capacity as an independent contractor.  Licensor agrees that neither it nor its employees will become an employee, partner, agent, or principal of Licensee by virtue of providing the Transitional Services and agrees it and its employees are not entitled to the rights or benefits afforded to License's employees, including disability or unemployment insurance, workers' compensation, medical insurance, sick leave, or any other employment benefit. Licensor is responsible for providing, at its own expense, disability, unemployment, and other insurance, workers' compensation, training, permits, and licenses for its employees and subcontractors. Licensor shall provide the Transitional Services under this Agreement under the general direction of Licensee, but Licensor shall determine, in Licensor's sole discretion, the manner and means by which the Transitional Services are provided.

## 3. PAYMENTS AND ROYALTIES

3.1     Royalties.  Commencing on January 1, 2018 and continuing and until this Agreement shall be terminated, and subject to the terms of this Agreement, Licensee shall pay Licensor a percentage of the Net Sales for each Reporting Period as follows ("**Royalties**"):

| Amount of Next Sales | Royalties |
| --- | --- |
| $0 to $4,999,999 million | 8% |
| $5 million to $9,999,999 million | 6% |
| $10 million to $14,999,999 million | 5% |
| $15 million and above | 4% |

(a) For clarification, no Royalties shall be due for any Sales made on or before December 31, 2017.

(b) When due, Royalties shall be calculated and paid monthly, and all payments due to Licensor under this Section 3.1 shall be due and payable by Licensee within thirty-five (35) days after the end of each Reporting Period in which the Royalty was earned, and shall be accompanied by a Sales Report as set forth in Section 4.2.

(c) In the event that a license granted by this Agreement becomes nonexclusive pursuant to the terms of this Agreement, the Royalties payable pursuant to this Section 3.1 shall be reduced to three and one half (3.5) percent of the Net Sales due and payable from on and after the date such license become nonexclusive.

(d) In the event any Patent Rights have expired or been found by a court of competent jurisdiction to be invalid or unenforceable, from and after the expiration or finding of invalidity or unenforceability, as the case may be, no Royalties will be due on the Net Sales for Products or Process that utilize such expired, invalid, or unenforceable Patent Rights.

3.2     Minimum/Advance on Royalty.

In any event, Licensee guarantees Licensor a total aggregate minimum royalty of $300,000, which shall be payable on the dates, and in the amounts, set forth below. On each of the dates set forth below, Licensee shall pay to Licensor the difference between the total aggregate Royalties actually paid to Licensor as of that date, pursuant to Section 3.1, and the aggregate minimum royalty amount set forth next to such date, all of which payments may be credited as provided in the following sentence but otherwise are nonrefundable. To the extent that Licensee's payment of the guaranteed $300,000 minimum royalty as set forth herein exceeds the actual Royalties due under Section 3.1, any such overpayment shall be deemed an advance payment on future Royalties owed to Licensor under Section 3.1.



| Date | Aggregate Minimum Royalties |
|------|------------------------------|
| January 15, 2018 | $50,000 |
| February 15, 2018 (an additional $50,000) | $100,000 |
| March 15, 2018 (an additional $50,000) | $150,000 |
| April 15, 2018 (an additional $50,000) | $200,000 |
| May 15, 2018 (an additional $50,000) | $250,000 |
| June 15, 2018 (an additional $50,000) | $300,000 |

3.3     Form of Payment.  All payments due under this Agreement shall be drawn on a United States bank and shall be payable in United States dollars. Conversion of foreign currency to U.S. dollars shall be made at the conversion rate existing in the United States, as reported in The Wall Street Journal, on the last working day of the applicable Reporting Period.  Such payments shall be without deduction of exchange, collection or other charges, and, specifically, without deduction of withholding or similar taxes or other government imposed fees or taxes, except as permitted in the definition of Net Sales or as required by Law. Payments shall be made by wire transfer to Licensor as follows:

ABA #011500120

Account #1316446368

Bank Citizens Bank

One Citizens Drive, Riverside Rhode Island

3.4     Overdue Payments.  If any payment due under this Agreement has not paid within three (3) days of the applicable due date ("**Applicable Due Date**"), Licensor shall provide five (5) days written notice to Licensee of such nonpayment. If the payment is not paid within the five (5) notice period, the unpaid payment shall be considered an "**Overdue Payment,**" and shall bear interest beginning on the Applicable Due Date. Interest shall be compounded annually at the rate of fifteen percent (15%), or if lesser, the maximum permitted by law.  Any such Overdue Payment when made shall be accompanied by all interest so accrued.  Said interest and the payment and acceptance thereof shall not preclude Licensor from exercising any other rights it may have as a consequence of the lateness of any payment.

3.5     Taxes.  Licensor shall be solely responsible for, and shall pay in a timely manner, all taxes and fees due as a result of Licensee's remittance of any payments, including Royalties, under this Agreement.

3.6     Offset for Indemnification Under APA:  In the event Licensee (a.k.a. "Purchaser" under the Assets Purchase Agreement) has any claim for indemnification against Licensor (a.k.a. "Seller" under the Assets Purchase Agreement), pursuant to Section 7.02(a) of Asset Purchase Agreement, and provided that Licensee has made all undisputed payments of the Purchase Price under the APA, Licensee shall have the right to offset any such owed indemnification against any payment of Royalties due under this Agreement until Licensee has been fully indemnified, to the extent that such claim for indemnification: 1) has been agreed to by the Parties; 2) has been determined by a final, non-appealable court order; or 3) relates to any Bulk Sales Claims. In addition, each calendar year, beginning with the calendar year of the Effective Date, Purchaser shall have the right to set off  against any Royalties (provided Licensee has made all undisputed payments of the Purchase Price under the APA) any claims for indemnification, whose liability in the aggregate with any other claims made under the APA during that same calendar year (excluding those claims agreed to by the Parties, determined by a final order, or relating to Bulk Sales Claims, as set forth in preceding sentence) has been valued (in Licensee's sole and absolute discretion) to be Twenty Thousand dollars ($20,000) or less. In the event that Licensee is not entitled to a set-off against Royalties as provided in the preceding sentence, Licensee shall be entitled withhold from payment of Royalties an amount equal to the value of any claim for indemnification (as determined in Licensee's sole



and absolute discretion), less any unused portion of the aggregate $20,000, which shall be offset against Royalties as provided in the preceding sentence, and shall deposit such withholdings into escrow. Any sums deposited into escrow shall only be released in accordance with: 1) a written agreement of the Parties; or 2) a non-appealable final order of a court with appropriate jurisdiction. The Parties agree to execute all escrow instructions necessary, or reasonably requested by escrowholder, to ensure the escrowed funds are released from escrow in accordance with this Section 3.6. All escrow costs shall be shared equally by the Parties.

## 4   REPORTS AND RECORDS

4.1    Diligence Reports.  Within one hundred twenty (120) days after the end of each calendar year, Licensee shall report in writing to Licensor with regard to the development and manufacturing of Products during such preceding twelve (12) months period, including without limitation the development of new Products, and the modification of extant Products. Notwithstanding the foregoing, as it regards the reporting of any development of Products, new Products, and the modification of extant Products, Licensee shall only be obligated to report the developments if Licensee intends to market the development within ten (10) months of the date of the report.

4.2    Sales Reports.  Licensee shall report to Licensor the date of the first commercial sale of each Product in each country of the License Territory within thirty (30) days of each such occurrence.  For each Reporting Period, Licensee shall prepare a sales report substantially the format outlined in **Appendix D** ("**Sales Report**"). Each Sales Report under this Section 4.2 shall be certified as correct by an officer of Licensee and shall contain at least the following information as may be pertinent to a royalty accounting hereunder for the Reporting Period being documented:

(a)    the number of Products Sold by Licensee and its Affiliates in each country;

(b)    the amounts billed, invoiced and received by Licensee and its Affiliates for each Product, in each country, and total billings or payments due or made for all Products;

(c)    calculation of Net Sales for the applicable Reporting Period in each country, including an itemized listing of permitted offsets and deductions;

(d)    total Royalties payable on Net Sales in U.S. dollars, together with the exchange rates used for conversion;

(e)    any other payments due to Licensor under this Agreement.

(f)    if no amounts are due to Licensor for any Reporting Period, the Sales Report shall so state.

Each Sales Report shall be submitted to Licensor within thirty-five (35) days of the end of the Reporting Period being documented in the Sales Report. Submission of the Sales Report shall be accompanied with payment of any Royalties due for the Reporting Period documented in the Sales Report.

4.3    Audit Rights.  Licensee shall maintain, and shall cause each of its Affiliates to maintain, complete and accurate records relating to the rights and obligations under this Agreement and any amounts payable to Licensor in relation to this Agreement, which records shall contain sufficient information to permit Licensor and its representatives to confirm the accuracy of any payments and reports delivered to Licensor and compliance in all other respects with this Agreement.  Licensee shall retain and make available, and shall cause each of its Affiliates to retain and make available, such records for at least two (2) years following the end of the calendar year to which they pertain, to Licensor and/or its representatives and upon at least fifteen (15) days' advance written notice, for inspection during normal business hours, to verify any reports and payments made and/or compliance in other respects under this Agreement.  If Licensor does not notice and conduct a review of Licensee's records within the two year period, or timely conducts such a review but does not provide written notice to Licensee of any objections



or disputes regarding the reviewed documents within the two year period, Licensor shall be deemed to have accepted all information, Sales Report and Royalties calculations presented to it by Licensee during that period to which the records pertain, and will be deemed a waiver of Licensor's right to further challenge the accuracy or appropriateness of the same. Notwithstanding the foregoing, in the event this Agreement is terminated, the two (2) year audit period described above shall be reduced to six (6) months from the date of termination, after which, Licensor shall have no further rights to audit Licensee's records, and Licensor shall be deemed to have accepted all information, Sales Report and Royalties calculations presented to it by Licensee during the Term of this Agreement, and will be deemed a waiver of Licensor's right to further challenge the accuracy or appropriateness of the same.

Licensor shall bear all costs associated with such audits, unless the examination conducted by Licensor or its representatives pursuant to the provisions of this Section shows an underpayment of five percent (5%) or more in any payment due to Licensor hereunder, in which case Licensee shall bear the full cost of such audit and shall remit any amounts due to Licensor (including interest due in accordance with Section 3.4) within thirty (30) days of receiving notice thereof from Licensor.

## 5. PATENT PROSECUTION AND MAINTENANCE

5.1     Prosecution.  Licensor shall be solely responsible for and, timely pay all sums required and necessary for (including attorney's fees), the preparation, filing, prosecution and maintenance of all patent applications and patents included in Patent Rights and Technological Information.  Licensor shall provide Licensee with a list of all United States and foreign patents and patent applications now or hereafter included within the Patent Rights that are issued by the USPTO or any foreign patent office or equivalent and the dates upon which any filings or maintenance fees are due. Licensor shall supplement this list upon the issuance of any new patents in the future which are included within the Patent Rights. Licensor shall provide Licensee with written confirmation of payment of all maintenance fees each calendar quarter on the fifteenth (15th) day of the first month of each quarter. If, for any reason, Licensor fails to make a required maintenance fee payment, Licensee and/or any of its Affiliates may, in its sole discretion, make the required maintenance fee payment, in which case Licensor shall reimburse Licensee within ten (10) business days for all sums and expenses paid (including attorney's) by Licensee related to or arising from Licensee's payment of the maintenance fee. If Licensor fails to timely reimburse Licensee, Licensee may offset such amounts from future Royalties due to Licensor under this Agreement.  Licensor hereby appoints Licensee and its Related Companies as Licensor's attorney-in-fact solely for the purpose of making any such maintenance fee payment.

Licensor shall be obligated to diligently prosecute all patent applications pending as of the Effective Date until Licensor provides written notice to Licensee of its decision not to continue the prosecution of a particular application ("**Notice of Intent Not to Prosecute**"). After giving the Notice of Intent Not to Prosecute, Licensor shall have no further obligation to continue the prosecution of the pending application so noticed. Licensor shall have no obligation to commence the filing and/or prosecution of any patent or claim applications not pending as of the Effective Date.

Licensee shall have the right, at its sole cost and expense, to continue the prosecution of any pending application for which Licensor provides a Notice of Intent Not to Prosecute. In the event Licensee assumes the prosecution of the pending application, Licensor shall assign 100% if all rights and interests in the pending application to Licensee. Licensor hereby appoints Licensee and its Related Companies as Licensor's attorney-in-fact solely for the purpose of making any such assignment.

5.2     Copies of Documents.  With respect to any patent application or patent included in the Patent Rights, Licensor shall instruct the patent counsel prosecuting such Patent Right to (i) copy Licensee on all patent prosecution and maintenance documents that are received from or filed with the United States Patent and Trademark Office and foreign equivalent, as applicable; (ii) if requested by Licensee, provide Licensee with copies of draft submissions to the USPTO prior to filing; and (iii) give fair and reasonable consideration to the comments and requests of Licensee or its patent counsel.

5.3     Confidentiality of Prosecution and Maintenance Information.  Licensee agrees to treat all information related to prosecution and maintenance of Patent Rights as Confidential Information in accordance with the provisions of **Appendix E**.

## 6.  THIRD PARTY INFRINGEMENT AND LEGAL ACTIONS

6.1     Licensor Right to Prosecute.  Within ten (10) days of learning of any: 1) infringement by any third party of any Claim of any Patent; 2) the unauthorized disclosure of any of the Technical Information or General Know-How to any person or entity (other than the Parties hereto and their employees); 3) any claim or suit alleging that the Patent Rights, Technological Information, or General Know-How infringe upon a third party's rights; or 4) any claim or suit alleging the Technical Information or General Know-How contains confidential information belonging to a third party (collectively "**Infringement Claims**"), the Party learning of any such Infringement Claims shall promptly notify the other Party in writing providing factual details thereof. Upon learning, from any source, of any Infringement Claims Licensor will protect the Patent Rights, Technical Information, and General Know-How from such infringement or disclosure, as the case may be. Licensor shall provide written notice  to Licensee within one (1) month of learning of any such Infringement Claims whether Licensor intends to prosecute the alleged infringement or disclosure ("**Defense Notice**").  If Licensor provides such Defense Notice, Licensor shall, within two (2) months of the Defense Notice either (i) cause such infringement or disclosure to terminate, or (ii) initiate legal proceedings against the infringer, or defend against claims of infringement, as the case may be, and shall immediately provide notice to Licensee when it has accomplished the same ("**Notice of Termination of Infringement Claims**"). Licensor shall be solely responsible for all costs, expenses (including attorney's fees) and liabilities in connection with any such action and shall indemnify and hold Licensee harmless therefrom, regardless of whether Licensee is a party-plaintiff. Before commencing such action, Licensor shall consult with Licensee, concerning, among other things, the advisability of bringing suit, the selection of counsel and the jurisdiction for such action, and shall use reasonable efforts to accommodate the views of Licensee regarding the proposed action. Notwithstanding the foregoing, Licensor shall have the right to control and manage such suit, proceeding and/or settlement in Licensor's sole discretion, and without Licensee's prior consent or approval.

6.2     Licensee Right to Prosecute.  In the event that Licensor fails to: 1) timely provide the Defense Notice; or 2) provide the Notice of Termination of Infringement Claims within 2 months of the Defense Notice, Licensee shall have the right, upon 5 days' notice to Licensor, to initiate or defend, as the case may be, legal proceedings against the infringer or disclosure, as the case may be. Before commencing such action, Licensee and as, applicable, any Affiliate, shall consult with Licensor, concerning, among other things, the advisability of bringing suit, the selection of counsel and the jurisdiction for such action, and shall use reasonable efforts to accommodate the views of Licensor regarding the proposed action. Notwithstanding the foregoing, Licensee shall have the right to control and manage such suit, proceeding and/or settlement in Licensee's sole discretion, and without Licensor's prior consent or approval. Licensor shall be solely liable for all costs, expenses (including reasonable attorney's fees) and liabilities in connection with any such action (collectively "**Legal Expenses**"), but Licensee shall be responsible for advancing the Legal Expenses, subject to the offset and reimbursement provisions set forth in this Section 6.2. In the event Licensee advances any Legal Expenses, Licensee may offset such Legal Expenses against any payments due to Licensor under this Agreement, including Royalties, until fully reimbursed.

6.3     Licensor and Licensee Joined as Party-Plaintiff.  If Licensor or Licensee elects to commence an action as described in Sections 6.1 or 6.2 above, Licensor or Licensee, as the case may be, shall join the action if requested by the other Party, and if not so requested, shall have, in its sole discretion, the option to join such action as a party-plaintiff.

6.4     Notice of Actions: Settlement.  Licensee and Licensor shall promptly inform the other Party of any action or suit relating to Patent Rights, Technical Information, and/or General Know-How.



6.5     Cooperation. Each Party agrees to cooperate reasonably in any action under Section 6 which is controlled by the other Party. Each Party shall bear its costs incurred as a cooperating party. Such controlling party shall keep the cooperating party informed of the progress of such proceedings and shall make its counsel available to the cooperating party.  The cooperating party shall also be entitled to independent counsel in such proceedings but at its own expense, said expense to be reimbursed from any damages received by the controlling Party bringing suit in accordance with Section 6.6.

6.6     Recovery. Any award paid by third parties as the result of such proceedings (whether by way of settlement or otherwise) shall first be applied to reimbursement of any legal fees and expenses incurred by either Licensee or Licensor, including their Affiliates, and then the remainder shall be divided between the Parties as follows:

        (a)     If Licensor was the controlling party under Section 6.1:

                (i)     First, Licensor shall receive an amount equal to the royalties and other amounts that Licensee would have paid to Licensor if Licensee had Sold the infringing Products rather than the infringer;

                (ii)     Second, Licensee shall receive an amount equal to its lost profits or a reasonable royalty on the infringing sales, or whichever measure of damages the court shall have applied; and

                (iii)     Third, the balance, if any, remaining after Licensee and Licensor have been compensated under Sections 6.6(a)(i) and (ii) shall be shall be shared equally by the Parties.

        (b)     If Licensee was the controlling party under Section 6.2:

                (i)     First, Licensee shall receive an amount equal to its lost profits or a reasonable royalty on the infringing sales, or whichever measure of damages the court shall have applied;

                (ii)     Second, Licensor shall receive an amount equal to the royalties and other amounts that Licensee would have paid to Licensor if Licensee had Sold the infringing Products and Services rather than the infringer; and

                (iii)     Third, the balance, if any, remaining after Licensee and Licensor have been compensated under Sections 6.6(b)(i) and (ii) shall be shall be shared equally by the Parties.

6.7     Notice of Other Claims. Within ten (10) days of learning of any third-party claims, other than infringement or misappropriation, related to or arising from the: 1) Patent Rights; 2) Technological Information; 3) General Know-How; or 4) the Products, including product defect claims, the Party learning of any such claims shall promptly notify the other Party in writing providing factual details thereof.

## 7.  INDEMNIFICATION AND INSURANCE

7.1     Indemnification.

        (a)     Licensee shall indemnify, defend and hold harmless Licensor and its Affiliates and their respective members, managers, directors, officers, employees, and agents and their respective successors, heirs and assigns (the "**Licensor's Indemnitees**"), against any liability, damage, loss or expense (including reasonable attorney's fees and expenses of litigation) incurred by or imposed upon the Licensor's Indemnitees or any one of them in connection with any claims, suits, actions, demands or judgments to the extent arising out of or relating to any Product made, used, or Sold by Licensee, unless such product liability theory arises from defects or information in the Patent Rights, Technical

Information, or General Know-How. For clarity, the indemnification set forth herein shall not apply to the Inventory.  Licensee also shall indemnify, defend and hold harmless Licensor's Indemnitees, against any liability, damage, loss or expense (including reasonable attorney's fees and expenses of litigation) incurred by or imposed upon the Licensor's Indemnitees or any one of them to the extent arising out of or relating to Licensee's prosecution of a pending patent application under Section 5.1.

(b)     Licensor shall indemnify, defend and hold harmless Licensee and its Affiliates and their respective members, managers, directors, officers, employees, and agents and their respective successors, heirs and assigns (the "**Licensee's Indemnitees**"), against any liability, damage, loss or expense (including reasonable attorney's fees and expenses of litigation) incurred by or imposed upon the Licensee's Indemnitees or any one of them in connection with any claims, suits, actions, demands or judgments that to the extent arise out of, relate to, or result from (i) any inaccuracy of any of Licensor's representations and warranties set forth in this Agreement, as of the date when made; (ii) the breach of any of the covenants or agreements of Licensor contained in this Agreement; and (iii) Licensor's prosecution of Infringement Claims as set forth in Section 6.1.

(c)     The indemnifying party under this Section 7.1, agrees, at its own expense, to provide attorneys reasonably acceptable to the indemnified party to defend against any actions brought or filed against any party indemnified hereunder with respect to the subject of indemnity contained herein, whether or not such actions are rightfully brought; provided, however, that any indemnified party shall have the right to retain its own counsel, at the expense of indemnifying party, if representation of such indemnified party by counsel retained by the indemnifying party would be inappropriate because of conflict of interests.  The indemnifying party agrees to keep the indemnified party informed of the progress in the defense and disposition of such claim and to consult with indemnified party prior to any proposed settlement.

(d)     This Section 7.1 shall survive expiration or termination of this Agreement.

(e)     THE INDEMNIFICATION PROVISIONS IN THIS ARTICLE 7.1 SHALL BE ENFORCEABLE REGARDLESS OF WHETHER THE LIABILITY IS BASED UPON PAST, PRESENT OR FUTURE ACTIONS OR OMISSIONS, CLAIMS OR LEGAL REQUIREMENTS.

7.2     Insurance.

(a)     Beginning at such time as any Product is being commercially distributed, sold, or otherwise transferred or by Licensee or an Affiliate, Licensee shall, at its sole cost and expense, procure and maintain commercial general liability insurance in amounts not less than $2,000,000 per incident and $2,000,000 annual aggregate and naming the Licensor as an additional insured (**"Licensee's Insurance"**).  Such commercial general liability insurance shall provide (i) product liability coverage and (ii) broad form contractual liability coverage for Licensee's indemnification under Section 7.1 of this Agreement.  Before electing to self-insure all or part of the limits described above, (including deductibles or retentions which are in excess of $250,000 annual aggregate), Licensee shall obtain Licensor's consent, which shall not be unreasonably withheld, .  The minimum amounts of insurance coverage required under this Section 7.2 shall not be construed to create a limit of Licensee's liability with respect to its indemnification under Section 7.1 of this Agreement.

(b)     Licensee shall provide Licensor with written evidence of Licensee's Insurance upon request of Licensor.  Licensee shall provide Licensor with written notice at least fifteen



(15) days prior to the cancellation, non-renewal or material change in Licensee's Insurance. If Licensee does not obtain replacement insurance providing comparable coverage prior to the expiration of such fifteen (15) day period, Licensor shall have the right to terminate this Agreement. In the event Licensor intends to terminate this Agreement for Licensee's failure to maintain the necessary insurance, Licensor shall provide Licensee with written notice and a thirty (30) day period to cure. If at the end of the thirty (30) day period Licensee has failed to obtain the necessary insurance, effective retroactively to the date on which Licensee's Insurance terminated, Licensor may terminate Agreement with written notice, effective immediately.

(c)     Licensee shall maintain Licensee's Insurance beyond the expiration or termination of this Agreement during (i) the period that any such Product is being commercially distributed, sold, leased or otherwise transferred, or performed by Licensee or an Affiliate Licensee and (ii) a reasonable period thereafter which in no event shall be less than five (5) years.

(d)     This Section 7.2 shall survive expiration of termination of this Agreement.

## 8. WARRANTIES; LIMITATION OF LIABILITY

8.1     Licensor represents and warrants that the following representations and warranties are true and correct as of the Effective Date of this Agreement:

(a) Title to Patent Rights.  Licensor is the sole owner of the Patent Rights, Technological Information, and General Know-How and has the authority to enter into this Agreement and license the Patent Rights, Technological Information, and General Know-How to Licensee. As of the Effective Date there are no liens or restrictions which will limit or otherwise affect the licenses and rights which are purported to be granted hereunder by it, except as otherwise imposed upon the Licensor by Law. Assignments from Schawbel Corporation to Licensor for Chinese patents SCHW-007/01CN and SCHA-008/01CN are attached hereto as **Exhibit 8.1(a)**. Within sixty (60) days following the Effective Date, Licensor shall provide a valid  assignment from Schawbel Corporation to Licensor, dated after August 2014, for U.S. patent no. 9,549,618.

(b) Valid and Enforceable. All Patent Rights are valid and enforceable as of the Effective Date of this Agreement. All fees, including maintenance fees, for the patent applications and patents included in the Patent Rights have been timely paid.

(c) No Infringement. If used in full compliance with this Agreement, Licensee's use of the Patent Rights, Technological Information, and General Know-How will not result in infringement or trade secret misappropriation of a third party, or contravene any Laws. There is no litigation pending, or, to the actual knowledge of Licensor, threatened (whether or not covered by insurance). There is no order, injunction, or decree outstanding nor any proceeding, or governmental investigation existing, pending, involving Patent Rights, Technological Information, or General Know-How (including claims for infringement or misappropriation). To the actual knowledge of Licensor, no event has occurred or circumstance exists that is reasonably likely to give rise to or serve as a basis for the commencement of any complaint, claim, action, suit, litigation, proceeding or governmental or administrative investigation involving or relating to the Patent Rights, Technological Information, or General Know-How.

(d) Exclusion. EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION 8.1, INCLUDING BUT NOT LIMITED TO SECTIONS 8.1(A), (B) AND (C) REGARDING TITLE, VALIDITY, AND NONINGRINGEMENT OF THE PATENT RIGHTS, LICENSOR MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, CONCERNING THE PATENT RIGHTS AND THE RIGHTS GRANTED HEREUNDER, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT, VALIDITY OF PATENT RIGHTS CLAIMS, WHETHER ISSUED OR



PENDING, AND THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, AND HEREBY DISCLAIMS THE SAME.

8.2     Limitation of Liability. Except in the event of fraud, no Related Person of Licensor shall have any personal liability to Licensee or any other Person as a result of the breach of any representation, warranty, covenant, agreement or obligation of Licensor in this Agreement and no Related Person of Licensee shall have any personal liability to Licensor or any other Person as a result of the breach of any representation, warranty, covenant, agreement or obligation of Licensee in this Agreement. In no event shall Licensor or any of its Related Person be liable to Licensee or any of its Affiliates and Related Persons for punitive damages arising out of this Agreement or the licenses granted hereunder.

8.3     All of Licensor's Patents: The Patent Rights include all patents and pending applications owned by Licensor, as of the Effective Date, that relate to the Heating Products.

8.4     Survival. All of the warranties and representations Licensor shall be true as of the Effective Date and shall survive the execution of this Agreement and shall terminate two (2) years following the termination of this Agreement.

[balance of page intentionally blank]



## 9.  TERM AND TERMINATION

9.1    Term. The term of this Agreement ("**Term**") shall commence on the Effective Date and shall remain in effect until the earlier of:

      (a)    the date on which all issued patents and filed patent applications within the Patent Rights have expired or been abandoned,

      (b)    five (5) year after the Effective Date, subject to Section 9.2.

9.2.    Option to Extend. Unless the Term of this Agreement is terminated earlier in accordance Sections 9.1, 9.4 or 9.5, in the event Licensee has, prior to the termination of the initial five year Term, paid Licensor aggregate Royalties correlating to the aggregate Sales of Products in the amount of $50 million or more, Licensee may elect by written notice to Licensor delivered prior to termination of the initial 5-year Term to extend the Term of this Agreement by an additional four (4) years as to any licenses that are exclusive as of the date of such extension and for an additional two (2) years as to any licenses that are nonexclusive as of the date of such extension, on the same terms and conditions set for in this Agreement. In no event shall Licensee have the right to extend the Term of this Agreement more than once pursuant to this Section 9.2.

9.3    Termination of Exclusivity.

      (a) In the event that all or some of the Patent Rights are sold to a third party, not including an Affiliate of Licensor, in accordance with Section 2.4, on and after the effective date of such sale Licensee's licenses of the Patent Rights sold to such third party shall be nonexclusive, at the election of Licensor, exercised by written notice to Licensee.

      (b) If Licensee has not paid Licensor aggregate Royalties correlating to aggregate Sales of Products in the amount of (i) $10 million  or more on or before December 31, 2019; (ii) $20 million or more on or before December 31, 2020; or (iii) $35  million or more on or before December 31, 2021, at the election of Licensor, exercised by written notice to Licensee, all licenses granted under this Agreement shall be non-exclusive from the date of such notice to termination of this Agreement in accordance with its terms.

      (c) Notwithstanding anything to the contrary, including Sections 9.3(a) and (b), all licenses granted under this Agreement to Licensee shall remain exclusive to Licensee for the two (2) years following the Effective Date.

9.4    Licensor's Right to Terminate. In addition to Section 9.1, Licensor shall have the right to terminate this Agreement under any of the following circumstances:

      (a) Termination for Failure to Pay.  If the event of an Overdue Payment under this Agreement or a failure to pay timely any payment due from "Purchaser" to "Seller" under the Asset Purchase Agreement ("**APA Nonpayment**"), each such Overdue Payment and APA Nonpayment shall be a default of this Agreement ("**Payment Default**"). Licensor shall provide thirty (30) days written notice of the default ("**Payment Default Notice**") to Licensee, and Licensor shall have the right to immediately terminate this Agreement at the expiration of the thirty (30) day notice period, unless Licensee has made such payments, and any interest due, as set forth in Section 3.4, or the comparable provision in the Asset Purchase Agreement.  Notwithstanding the above, if Licensee has two (2) or more Overdue Payments and/or APA Nonpayments within any consecutive twelve (12) months period, Licensor shall be entitled to terminate this Agreement effective immediately upon written notice to Licensee.

      (b) Termination for Insurance and Insolvency.

            (i) Insurance.  Licensor shall have the right to terminate this Agreement in accordance with Section 7.2(b) if Licensee fails to maintain the insurance required by Section 7.2.



(ii) <u>Insolvency and other Bankruptcy Related Events</u>.  Licensor shall have the right to terminate this Agreement immediately upon written notice to Licensee with no further notice obligation or opportunity to cure if Licensee: (i) shall make an assignment for the benefit of creditors; or (ii) or shall have a petition in bankruptcy filed for or against it.

(c) <u>Termination for Non-Financial Default</u>.  If Licensee or any of its Affiliates shall default in the performance of any of its obligations under this Agreement not otherwise covered by the provisions of <u>Sections 9.4</u>, and if such default has not been cured within sixty (60) days after notice by Licensor in writing of such default, Licensor may immediately terminate this Agreement, and/or any license granted hereunder with respect to the country or countries in which such default has occurred, at the end of said sixty (60) days cure period.

9.5    <u>Licensee's Right to Terminate</u>. In addition to <u>Section 9.1</u>, Licensee shall have the right to terminate this Agreement under any of the following circumstances:

(a) <u>Termination for Judgment Related to Patent Rights, Technological Information, or General Know-How.</u> If any legal action is commenced by a third party alleging patent, trademark, or copyright infringement or misappropriation as a result of Licensee's manufacture and/or sale of Products, which, if proven, would impair (in Licensee's reasonable judgment) Licensor's ability to use and/or enjoy certain Patent Rights, Technological Information, and/or General Know-How, Licensee may immediately terminate the license of Patent Rights, Technological Information, or General Know-How so impaired. Furthermore, in the event that the Patent Rights, Technological Information, or General Know-How impaired by the legal action materially impact, in the reasonable judgment of Licensee, Licensee's use and enjoyment of other Patent Rights, Technological Information, or General Know-How, Licensee may immediately terminate this Agreement and/or any license granted hereunder.

(b) <u>Termination for Transfer of Control of Patent Rights, Technological Information, or General Know-How.</u> If Licensor enters into an agreement with a third party, the effect of which is to transfer ownership or control of the Patent Rights, Technological Information, or General Know-How, whether through an outright sale of the same, an assignment of this Agreement, or a change in control of Licensor through stock sale (of 50% or more of stock), merger, or acquisition, Licensee may immediately terminate this Agreement and/or any license granted hereunder.

(c) <u>Termination for Licensor's Failure to Comply with ROFR.</u> If Licensor fails to comply with the terms of <u>Section 2.4,</u> and such failure has not been cured within fifteen (15) days after notice by Licensee in writing of such failure, Licensee may immediately terminate this Agreement, and/or any license granted hereunder.

(d) <u>Termination for Assignment</u>. If Licensor assigns this Agreement, without the prior written consent of Licensee, Licensee may immediately terminate this Agreement and/or any license granted hereunder.

(e) <u>Termination for Non-Financial Default</u>. If Licensor shall default in the performance of any of its obligations under this Agreement, including but not limited to any representation and warranty set forth in <u>Section 8</u>, and if such default has not been cured within sixty (60) days after notice by Licensee in writing of such default, Licensee may immediately terminate this Agreement, and/or any license granted hereunder with respect to the country or countries in which such default has occurred, at the end of said sixty (60) days cure period.

(f) <u>Licensor's Breach of Non-Compete</u>. Licensee shall have the right to terminate this Agreement in accordance with <u>Section 11.1</u>.

9.6    <u>Effects of Termination of Agreement</u>.  Upon termination of this Agreement or any of the licenses hereunder for any reason, final Sales Reports in accordance with <u>Section 4</u> shall be submitted to Licensor



and all Royalties and other payments accrued or due to Licensor as of the termination date shall become immediately due and payable within thirty (30) calendar days. Licensee shall cease, and shall cause its Affiliates to cease, all production, use and Sales of Products upon such termination, subject to Section 9.11. The termination or expiration of this Agreement or any license granted hereunder shall not relieve Licensee and its Affiliates of obligations arising before such termination or expiration.

9.7     Inventory. Upon termination of this Agreement, Licensee and Licensee Affiliates may complete and sell any work-in-progress and inventory of Products on hand or ordered that exist as of the effective date of termination provided that (i) Licensee pays Licensor the applicable Royalty or other amounts due on such Net Sales in accordance with the terms and conditions of this Agreement, and (ii) Licensee and Affiliates shall complete and sell all work-in-progress and inventory of Products within six (6) months after the effective date of termination if such termination is for two (2) or more Overdue Payment, and otherwise within eighteen (18) months; provided, however, there shall be no such post-termination completion and sales period if such termination is for a breach of Section 7.2 and Licensee immediately upon such termination shall cease and shall cause its Affiliates to cease all production, use and Sale of Products.

9.8     Perpetual License of General Know-How. Upon the termination of this Agreement, provided termination is not for two (2) or more Overdue Payments, the license of the General Know-How, but not Patent Rights or Technological Information, granted by Licensor to Licensee under this Agreement shall, as of the effective date of the termination, become a perpetual, irrevocable, non-exclusive, and royalty-free license to Licensee of the General Know-How only. Such perpetual license shall not in any respect grant Licensee any rights with respect to, or allow Licensee the use of, the Patent Rights and/or the Technological Information.

## 10.  COMPLIANCE WITH LAW

10.1    Compliance. Licensee shall have the sole obligation for compliance with, and shall ensure that any Affiliates comply with, all government statutes and regulations applicable to Licensee's use of the Patent Rights, Technological Information, and General Know-How and any applicable laws and regulations of any other country applicable to Licensee's use of the Patent Rights, Technological Information, and General Know-How. Licensee agrees that it shall be solely responsible for obtaining any necessary licenses to export, re-export, or import Products covered by Patent Rights, Technological Information, General Know-How, and/or Confidential Information. Licensee shall indemnify and hold harmless Licensor for any breach of Licensee's obligations under this Section 10.1.

10.2    Patent Numbers. Licensee shall cause all Products sold in the United States to be marked with all applicable U.S. Patent Numbers to the full extent required by United States law. Licensee shall similarly cause all Products shipped to or sold in any other country to be marked in such a manner as to conform with the patent laws and practices of such country.

## 11.  FUTURE ACTS

11.1    Competitive Products, Covenant to Not Compete. During the Term of this Agreement, and while the licenses granted hereunder are exclusive to Licensee, and in order to protect the value of the licenses granted under this Agreement, neither Licensor nor its Affiliates or Related Persons (or any of them) shall manufacture, have manufactured, distribute, have distributed, market, have marketed, or sell, or have sold, any product that is competitive with the Heating Products. In the event Licensor or its Affiliates or Related Persons manufactures, has manufactured, distributes, has distributed, or sells, or has sold, any such competing product, such an event shall be a default by Licensor under this Agreement and Licensee may terminate this Agreement if such default has not been cured within ninety (90) days after notice by Licensee in writing of such default. Furthermore, from and after Licensor's default, no Royalties shall be due or shall accrue on any Net Sales so long as Licensor is in breach of the covenant set forth in this Section 11.1. In addition, the Parties agree that a breach or threatened breach of any covenant set forth in



this Section 11.1 could cause irreparable harm to Licensee, that Licensee's remedies at Law upon any such breach would be inadequate, and that, accordingly, upon any such breach or threatened breach Licensee may seek a restraining order or injunction or both against the Licensor or its Affiliates or Related Persons, in addition to any other rights and remedies which are available at Law for breach of the covenant. If any provision of this Section 11.1 shall be determined to be invalid or unenforceable, such invalid or unenforceable term shall be deemed amended to allow as to such maximum time and territory and to such other extent as such court (or arbitral tribunal) may judicially determine or indicate to be reasonable.

Notwithstanding the foregoing, such provision shall not apply, provided Licensor or its Related Persons and their Affiliates first obtains a confidentiality agreement signed by the Third Party Purchaser, to Licensor's efforts to: (i) market and sell, or otherwise assign, such Patent Rights pursuant to Section 2.4 to a third-party purchaser ("**Third Party Purchaser**"), or (ii) following such sale or assignment of such Patent Rights to the Third Party Purchaser, activities reasonably necessary to effectuate the intent of the sale or assignment of the Patent Rights to the Third Party Purchaser..

11.2    Licensee's Rights to Market. Subject to the terms and conditions of this Agreement, Licensee and its Affiliates shall be free to commercialize, develop, market and sell Products and Heated Insoles in its sole judgment, and sell such Products and Heated Insoles at any price determined by the Licensee and/or its Affiliates in its sole and absolute discretion, except to the extent any such obligation is otherwise imposed upon by Law.

11.3    Licensee's Improvements. Any and all rights to any Improvements made by Licensee shall belong solely to Licensee and Licensor shall have no rights, legal or equitable, in such Improvements.

## 12. MISCELLANEOUS

12.1    Entire Agreement. This Agreement constitutes the entire understanding between the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings pertaining to the Patent Rights and Technology.

12.2    Notices. Any notices, reports, waivers, correspondences or other communications required under or pertaining to this Agreement shall be in writing and shall be delivered by hand, or sent by a reputable overnight mail service (e.g., Federal Express), or by first class mail (certified or registered), or by facsimile confirmed by one of the foregoing methods, to the other party. Notices will be deemed effective (a) three (3) business days after deposit, postage prepaid, if mailed, (b) the next day if sent by overnight mail, or (c) the same day if sent by facsimile and confirmed as set forth above or delivered by hand. Unless changed by a writing delivered to the other Party, notices to the Parties shall be directed as follows:

Schawbel Technologies, LLC

67 Bedford Street, Suite 400W

Burlington MA 01803

Attn: William Schawbel

Email: bill@schawbeltech.com

Tel No: 617-281-2557

Fax No.

Heat Factory, USA, Inc.

1958 Kellogg Ave.

Carlsbad, CA 92008

Attn: David Treptow

Email: Dave@heatfactroyusa.com

Tel No: 760-893-8300

Fax No. 760-893-8301

12.3    Amendment; Waiver.  This Agreement may be amended and any of its terms or conditions may be waived only by a written instrument executed by an authorized signatory of each of the Parties or, in the case of a waiver, by the Party waiving compliance.  The failure of either Party at any time or times to require performance of any provision hereof shall in no manner affect its rights at a later time to enforce the same.  No waiver by either Party of any condition or term shall be deemed as a further or continuing waiver of such condition or term or of any other condition or term.

12.4    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the Parties hereto and their respective permitted successors and assigns.

12.5    Assignment.  Neither Licensee nor Licensor may assign this Agreement or any of its rights or obligations under this Agreement without the prior written consent of the other Party. Notwithstanding the foregoing, Licensor may assign its rights to receive Royalties under Section 3 to its Affiliate or a purchaser of Patent Rights.

12.6    Force Majeure.  Neither Party shall be responsible for delays resulting from causes beyond the reasonable control of such Party, including without limitation fire, explosion, flood, war, sabotage, strike or riot, provided that the nonperforming Party uses commercially reasonable efforts to avoid or remove such causes of nonperformance and continues performance under this Agreement with reasonable dispatch whenever such causes are removed.

12.7    Public Announcements.  Neither Party shall issue any press release, or make any public statement with respect to this Agreement or any of the transactions contemplated hereby, prior to the Closing Date, without the prior written consent of the other Party, except as may be required by applicable Law or any listing agreement with a national securities exchange or quotation system. Notwithstanding foregoing, Licensee shall have the right to record a memorandum of this Agreement for purposes of recording the licenses set forth herein with the United States Patent and Trademark Office, such memorandum shall not disclose any of the financial terms of this Agreement. After the Closing Date, the Parties may issue a press release or make a public statement with respect to this Agreement or any of the transactions contemplated hereby without the prior written consent of the other Party provided, however, that neither Party shall, without the prior written consent of the other Party, disclose publicly any of the financial terms of this Agreement.

12.8    Governing Law.  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the Commonwealth of Massachusetts, excluding with respect to conflict of laws, except that questions affecting the construction and effect of any patent shall be determined by the law of the country in which the patent shall have been granted.

12.10   Severability.  If any provision(s) of this Agreement are or become invalid, are ruled illegal by any court of competent jurisdiction or are deemed unenforceable under then current applicable law from time to time in effect during the term hereof, it is the intention of the parties that the remainder of this Agreement shall not be effected thereby.  It is further the intention of the parties that in lieu of each such provision which is invalid, illegal or unenforceable, there be substituted or added as part of this Agreement a provision which shall be as similar as possible in economic and business objectives as intended by the parties to such invalid, illegal or enforceable provision, but shall be valid, legal and enforceable.

12.11   Survival.  In addition to any specific survival references in this Agreement, Sections 5.3, 9.6, 9.7 and 9.8 shall survive termination or expiration of this Agreement.



12.11   Interpretation.  The parties hereto are sophisticated, have had the opportunity to consult legal counsel with respect to this transaction and hereby waive any presumptions of any statutory or common law rule relating to the interpretation of contracts against the drafter.

12.12   Headings.  All headings are for convenience only and shall not affect the meaning of any provision of this Agreement.

12.13   Counterparts.  This Agreement may be executed in two (2) or more counterparts, and by facsimile, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

12.14   Attorney Fees and Costs.  In the event of any controversy, claim or dispute between the parties to this Agreement, arising out of or relating to this Agreement, its enforcement or interpretation, or any breach of any provision of this Agreement, the prevailing party, in addition to its other remedies, shall be entitled to recover from the losing party the prevailing party's reasonable expenses, attorney fees, and costs, including those incurred on appeal and for enforcement of an award or judgment.

[*signatures on next page*]



IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date first written above.

SCHAWBEL TECHNOLOGIES LLC.                    HEAT FACTORY, USA, INC.


BY: _____         BY: _____

   Name: _____                Name: David Treptow   7-18-17

TITLE: _____              TITLE: President

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date first written above.

**SCHAWBEL TECHNOLOGIES LLC.**                    **HEAT FACTORY, USA, INC.**

BY: _Wili Schwbel_                        BY: _____

 Name:                                 Name: David Treptow

TITLE: ___C.E.O___                    TITLE: President

Exclusive Patent Licensing Agreement Documents

| Schedule/Exhibits | Description | Completed |
|---|---|---|
| Appendix A | Heating Products | x |
| Appendix B | Certifications | x |
| Appendix C | Patents | x |
| Schedule 2.5 | Transitional Services | x |
| Appendix D | Sales Report | x |
| Appendix E | Confidentiality Terms and Conditions | x |
| Exhibit 8.1(a) | Patent Assignments | x |

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

### Exclusive Patent Licensing Agreement Documents

| Schedule/Exhibits | Description | Completed |
|---|---|---|
| Appendix A | Heating Products | x |
| Appendix B | Certifications | x |
| Appendix C | Patents | x |
| Schedule 2.5 | Transitional Services | x |
| Appendix D | Sales Report | x |
| Appendix E | Confidentiality Terms and Conditions | x |
| Exhibit 8.1(a) | Patent Assignments | x |

Exhibits to Heat Factory, USA, Inc. /Schawbel Technologies, LLC. Exclusive Patent Licensing Agreement

           Purchaser      Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

## Appendix A
## HEATING PRODUCTS

See attached list which is incorporated herein by reference

Exhibits to Heat Factory, USA, Inc. /Schawbel Technologies, LLC. Exclusive Patent Licensing Agreement

Purchaser            Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

**Appendix A**

**HEATING PRODUCTS**

See attached list which is incorporated herein by reference

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

**APPENDIX A**

## HEATING PRODUCTS

- ThermaCELL Heated Insoles
- ThermaCELL Heated Insoles - Car Charger
- ThermaCELL Heated Insoles ProFLEX
- ThermaCELL Heated Insoles ProFLEX - Battery Pack
- ThermaCELL Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth®)
- ThermaCELL Heated Insoles ProFLEX Heavy Duty - Battery Pack
- ThermaCELL Heat Packs Hand Warmers
- ThermaCELL Heat Packs Pocket Warmer
- ThermaCELL Heat Packs Bluetooth® Pocket Warmer

## Appendix B
## CERTIFICATIONS

See attached list which is incorporated herein by reference

Purchaser          Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

**Appendix B**

**CERTIFICATIONS**

See attached list which is incorporated herein by reference

Exhibits to Heat Factory, USA, Inc. /Schawbel Technologies, LLC. Exclusive Patent Licensing Agreement

_____   _____
     Purchaser              Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

## Certifications

### Heated Insoles (THS01)

#### US
Power supply UL certified
Car charger UL certified
Battery UR certified and UN DOT 38.3 certified
FCC Class B.  Remote is FCC Licensed.
CEC Compliant
Prop 65 compliant

#### Canada
Power Supply  cUL Certified
Car charger UL certified
Battery UR certified and UN DOT 38.3 certified
ICES Class B.  Remote is ICES Licensed.

#### Europe
Power Supply CE certified
Car charger CE certified
Battery CE Certified
Power Supply, remote and insoles – CE certified
Directives Applied for CE: Low Voltage, EMC, RTT&E (transitioning
to RED), ROHS, ErP, Packaging and Packaging Waste

#### Russia
Power Supply EAC certified
Car Charger EAC certified

#### India
Remote Certified

### Heated Insoles ProFLEX (HW20)
#### US
Power supply UL certified
Battery UR certified and UN DOT 38.3 certified
FCC Class B.  Remote is FCC Licensed.
Mag 141 is CEC Compliant
Prop 65 compliant

#### Canada
Power Supply  cUL Certified
Battery UR certified and UN DOT 38.3 certified
ICES Class B.  Remote is ICES Licensed.

#### Europe
Power Supply CE certified
Battery CE Certified
Power Supply, remote and insoles – CE certified
Directives Applied for CE: Low Voltage, EMC, RTT&E (transitioning
to RED), ROHS, WEEE

### Heated Insoles ProFLEX Heavy Duty (w/ Bluetooth) (PFHD)
#### US
Power supply UL certified
Battery UR certified and UN DOT 38.3 certified
Insole is FCC Licensed.
MAG 143 is CEC Compliant
Prop 65 compliant

#### Canada
Power Supply cUL Certified
Battery UR certified and UN DOT 38.3 certified
Insole is ICES Licensed.

#### Europe
Power Supply CE certified
Battery CE Certified

Directives Applied for CE: Low Voltage, EMC, RTT&E (transitioning
to RED), ROHS

### Heat Packs - Hand Warmers (2 pack) (PAK-S)
#### US
Power supply is UL certified
Battery is UR certified and UN DOT 38.3 compliant
FCC Tested for Class B
CEC Energy Efficient compliant
Prop 65 compliant

#### Canada
Power supply is cUL certified
ICES Tested for Class B
CEC Energy Efficient

#### Europe
Power supply is CE certified
Battery is CE certified
CISPR 14 compliant
Directives Applied for CE: Low Voltage, EMC, ROHS

### Heat Packs - Pocket Warmer (1 pack) (PAK-L)
#### US
Power supply is UL certified
Battery is UR certified and UN DOT 38.3 compliant
FCC Tested for Class B
CEC Energy Efficient compliant
Prop 65 compliant

#### Canada
Power supply is cUL certified
ICES Tested for Class B
CEC Energy Efficient

#### Europe
Power supply is CE certified
Battery is CE certified
CISPR 14 compliant
Directives Applied for CE: Low Voltage, EMC, ROHS

### Heat Packs - Bluetooth Pocket Warmer (1 pack) (PAK-BL)
#### US
Power supply is UL certified
Battery is UR certified and UN DOT 38.3 compliant
FCC Licensed for BT
CEC compliant

#### Canada
Power supply is cUL certified
ICES Licensed for BT

#### Europe
Power supply is CE certified
Battery is CE certified
CISPR 22 compliant

7-18-17
MM

# Appendix C

## PATENTS

See attached list which is incorporated herein by reference

Purchaser          Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

## Appendix C
## PATENTS

See attached list which is incorporated herein by reference

Purchaser _____ Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

| Docket Reference | Title | Application Number | Filing Date | Status | Patent Number | Issue Date |
|---|---|---|---|---|---|---|
| SCHW-001/01CA | HEATED INSOLE WITH REMOVABLE AND RECHARGEABLE BATTERY | 2930858 | 4/9/2014 | Published | | |
| SCHW-001/01EP | HEATED INSOLE WITH REMOVABLE AND RECHARGEABLE BATTERY | 14866929 | 4/9/2014 | Published | | |
| SCHW-001/01US | HEATED INSOLE WITH REMOVABLE AND RECHARGEABLE BATTERY | 14/248861 | 4/9/2014 | Granted | 8869428 | 10/28/2014 |
| SCHW-001/01US-2 | HEATED INSOLE WITH REMOVABLE AND RECHARGEABLE BATTERY | 14/511528 | 10/10/2014 | Granted | 9179734 | 11/10/2015 |
| SCHW-001/02US | SHOE WITH A HEATED INSOLE | 14/248891 | 4/9/2014 | Granted | 9538806 | 1/10/2017 |
| SCHW-001/02US-2 | SHOE WITH A HEATED INSOLE | 15/345687 | 11/8/2016 | Published | | |
| SCHW-001/03US | BATTERY FOR USE WITH A HEATED INSOLE | 14/248915 | 4/9/2014 | Granted | 9549586 | 1/24/2017 |
| SCHW-001/04US | ASSEMBLY FOR INCLUSION IN A HEATED INSOLE | 14/248934 | 4/9/2014 | Granted | 9538807 | 1/10/2017 |
| SCHW-001/05US | HEATED INSOLE WITH REMOVABLE AND RECHARGEABLE BATTERY | 14/285118 | 5/22/2014 | Granted | 8869429 | 10/28/2014 |
| SCHW-002/00CAD | INSOLE | 156951 | 6/3/2014 | Granted | 156951 | 6/26/2015 |
| SCHW-002/00IND | INSOLE FOR FOOTWEAR | 263667 | 6/25/2014 | Granted | 263667 | 4/9/2015 |
| SCHW-002/00USD | INSOLE | 29/487518 | 4/9/2014 | Granted | D734012 | 7/14/2015 |
| SCHW-002/01CADIV | INSOLE | 161639 | 3/20/2015 | Granted | 161639 | 6/26/2015 |
| SCHW-002/01EUD | INSOLE | 2460501 | 5/8/2014 | Granted | 002460501-0001-0004 | 6/26/2014 |
| SCHW-002/01RUD | INSOLE (WHOLE AND PARTS) | 2014502050 | 5/26/2014 | Granted | 94566 | 7/7/2015 |
| SCHW-002/01USD | INSOLE | 29/529475 | 6/8/2015 | Granted | D772546 | 11/29/2016 |
| SCHW-003/00IND | INSOLE FOR FOOTWEAR | 263668 | 6/25/2014 | Granted | 263668 | 4/9/2015 |
| SCHW-003/00USD | INSOLE | 29/487520 | 4/9/2014 | Granted | D722222 | 2/10/2015 |
| SCHW-003/01CAD | INSOLE | 156952 | 6/3/2014 | Granted | 156952 | 6/26/2015 |
| SCHW-004/00IND | BATTERY PACK FOR AN INSOLE OF FOOTWEAR | 263669 | 6/25/2014 | Granted | 263669 | 4/9/2015 |
| SCHW-004/01CAD | BATTERY PACK FOR AN INSOLE | 29/487523 | 4/9/2014 | Granted | D724013 | 3/10/2015 |
| SCHW-004/01EUD | BATTERY PACK FOR AN INSOLE | 2460238 | 5/8/2014 | Granted | 002460238-0001-0003 | 6/16/2014 |
| SCHW-004/01RUD | BATTERY PACK FOR AN INSOLE, BOTTOM PART FOR A BATTERY PACK OF INSOLE AND A CONNECTOR FOR BATTERY PACK | 2014502049 | 5/26/2014 | Granted | 93958 | 5/26/2015 |
| SCHW-005/00USD | BATTERY PACK FOR AN INSOLE | 29/487528 | 4/9/2014 | Granted | D719504 | 12/16/2014 |
| SCHW-005/01CAD | BATTERY PACK FOR AN INSOLE | 156528 | 5/8/2014 | Granted | 156528 | 3/4/2015 |
| SCHW-006/00USD | BATTERY PACK FOR AN INSOLE | 29/487530 | 4/9/2014 | Granted | D737769 | 9/1/2015 |
| SCHW-006/01CAD | BATTERY PACK FOR AN INSOLE | 156529 | 5/8/2014 | Granted | 156529 | 3/4/2015 |
| SCHW-007/01AU | HEATED INSOLE REMOTE CONTROL SYSTEM | 2012369199 | 2/6/2012 | Granted | 2012369199 | |
| SCHW-007/01CA | HEATED SHOE INSOLE REMOTE CONTROL SYSTEMS | 2869619 | 2/6/2012 | Published | | |
| SCHW-007/01CN | HEATED INSOLE REMOTE CONTROL SYSTEM | 201280069099X | 2/6/2012 | Allowed | | |
| SCHW-007/01EP | HEATED SHOE INSOLE REMOTE CONTROL SYSTEMS | 12868182 | 2/6/2012 | Published | | |
| SCHW-007/01HK | HEATED INSOLE REMOTE CONTROL SYSTEM | 15100071 | 1/6/2015 | Published | | |
| SCHW-007/01IN | HEATED SHOE INSOLE REMOTE CONTROL SYSTEMS | 7249/DELNP/2014 | 2/6/2012 | Published | | |
| SCHW-007/01RU | HEATED SHOE INSOLE REMOTE CONTROL SYSTEM | 2014132454 | 2/6/2012 | Granted | 2597584 | 8/22/2016 |
| SCHW-007/01UA | HEATED SHOE INSOLE REMOTE CONTROL SYSTEMS | a2014 09690 | 2/6/2012 | Granted | 111527 | 5/10/2016 |
| SCHW-007/01US | HEATED INSOLE REMOTE CONTROL SYSTEM | 13/166351 | 6/22/2011 | Granted | 8850716 | 10/7/2014 |
| SCHW-007/02US | HEATED INSOLE REMOTE CONTROL SYSTEMS | 14/466477 | 8/22/2014 | Granted | 9101177 | 8/11/2015 |
| SCHW-008/01AU | HEATED INSOLES | 2012362389 | 12/27/2012 | Granted | 2012362389 | 3/9/2017 |
| SCHW-008/01CA | HEATED INSOLES | 2861600 | 12/27/2012 | Allowed | | |
| SCHW-008/01CN | HEATED INSOLES | 201280065577X | 12/27/2012 | Allowed | | |
| SCHW-008/01EP | HEATED INSOLES | 12821353 | 12/27/2012 | Published | | |
| SCHW-008/01HK | HEATED INSOLES | 15100230 | 12/27/2012 | Published | | |
| SCHW-008/01IN | HEATED INSOLES | 6371/DELNP/2014 | 12/27/2012 | Published | | |
| SCHW-008/01RU | HEATED INSOLES | 2014127752 | 12/27/2012 | Granted | 2600439 | 9/28/2016 |
| SCHW-008/01UA | A CHARGING SYSTEM FOR A HEATED INSOLE FOR SHOES | a201408621 | 12/27/2012 | Granted | 112278 | 8/10/2016 |

7-18-17
DTT

**Appendix C**

| Docket Reference | Title | Application Number | Filing Date | Status | Patent Number | Issue Date |
|---|---|---|---|---|---|---|
| SCHW-008/01US | HEATED INSOLES | 13/728336 | 12/27/2012 | Granted | 9548618 | 1/17/2017 |
| SCHW-010/02CA | HEATED PACKS | 2959132 | 7/1/2015 | Published | | |
| SCHW-010/02EP | HEATED PACKS | 15836668 | 7/1/2015 | Pending | | |
| SCHW-010/02US | HEATED PACKS | 15/506500 | 2/24/2017 | Pending | | |
| SCHW-012/01US | ASSEMBLY | 14/568516 | 12/12/2014 | Granted | 9314064 | 4/19/2016 |
| SCHW-012/01WO | HEATED INSOLE WITH REMOVABLE HEATING ASSEMBLY | PCT/US2015/062458 | 11/24/2015 | Published | | |
| SCHW-013/01US | HEATED INSOLE WITH REMOVABLE ASSEMBLY | 14/719819 | 5/22/2015 | Granted | 9572397 | 2/21/2017 |
| SCHW-013/01WO | HEATED INSOLE WITH REMOVABLE ASSEMBLY | PCT/US2016/032891 | 5/17/2016 | Published | | |
| SCHW-017/00CAD | HEAT PACK | 163521 | 7/23/2015 | Granted | 163521 | 7/5/2016 |
| SCHW-017/00EPD | HEAT PACK | 2741934 | 7/23/2015 | Granted | 002741934-0001-0002 | 12/14/2015 |
| SCHW-017/00USD | HEAT PACK | 29/533210 | 7/15/2015 | Pending | | |

## SCHEDULE 2.5
## TRANSITIONAL SERVICES

See attached list which is incorporated herein by reference

Exhibits to Heat Factory, USA, Inc. /Schawbel Technologies, LLC. Exclusive Patent Licensing Agreement

Purchaser        Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

## SCHEDULE 2.5

## TRANSITIONAL SERVICES

See attached list which is incorporated herein by reference

Exhibits to Heat Factory, USA, Inc. /Schawbel Technologies, LLC. Exclusive Patent Licensing Agreement

_____     _____
Purchaser                Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

## Schedule 2.5

### Transitional Services

The timetable of the transition should not exceed one hundred twenty days with most tasks completed within sixty days based on resource availability from HF.

Tasks categorized by days estimated for completion:

A.  0 – 30 Days
- ❖ Transition account management, contracts, terms and conditions, promotions, rebates, shipping requirements, unique SKUs, marketing, etc.
- ❖ Provide historical customer data file from QuickBooks for 2016.
- ❖ Deliver electronically all designs, art files, and marketing collateral relating to product and packaging.
- ❖ Make agreed upon modifications to the internet site to reflect the business transaction.  Determine date to redirect URL.
- ❖ Transition all digital assets for commerce and customer service to HF.
- ❖ Transition software support contract to HF.
- ❖ Transition customer service to HF.  This will include a one day on site training session and all related training documentation.  Will provide introduction to OnBrand.

B.  0 – 60 Days
- ❖ Provide account and sales introduction to all major existing customers. Schedule meetings with critical buyers and participate in such meetings.
- ❖ Introduction to Independent Sales Representative Groups and transition account management as required by HF.  Terminate Independent Sales Representative Agreements as required for those not being utilized going forward.
- ❖ Introductions to Pro Staffers and transition to HF as required.
- ❖ Provide details of all key historical marketing activities, assets, trade shows, etc.
- ❖ Provide introduction to third party resources that assisted in the design, development, and production of the heated products included in the transaction to include engineers, factory management, and SATRA testing personnel.
- ❖ Provide detailed flow chart of current product design process.

C.  0 – 90 Days
- ❖ Provide introduction to third party resources to review future product concepts.
- ❖ Provide introductions and facilitate the relationships between HF and the key product suppliers, factories and certifications, provide electronic copies of BOM's, manufacturing and final product testing and related engineering documents.
- ❖ Assist with the transfer of product certifications in the USA and other countries during the transition.

D.  0 – 120 Days
- ❖ Manage third party PR and social media for a period of four months. This includes the draft and execution of a completed partnership announcement and management of the PR placement of such an announcement.  Third party fees to be paid by HF.  Transition third party resources to HF if required.

# APPENDIX  D
## SALES REPORTS

See attached exemplar which is incorporated herein by reference

Purchaser          Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

## APPENDIX D

## SALES REPORTS

See attached exemplar which is incorporated herein by reference

_____        _____
Purchaser                    Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

| TEM | SIZE | INVOICE | | QUANTITY | INV DISC % | PRICE | NET AMOUNT |
|---|---|---|---|---|---|---|---|
| M110 | os | 55796 | NOV 17 14 | 160.00 | | 0.9000 | 144.00 |
| M110 | os | 56738 | DEC 18 14 | 40.00 | | 0.6900 | 27.60 |
| M110 | os | 56939 | DEC 10 14 | 130.00 | | 0.2500 | 32.50 |
| | M110 | | Mossy Oak Footwarmers | 330.00 | | | 204.10 |
| | | STYLE SUBTOTAL M110 | | 330.00 | | | 204.10 |
| M110BX | os | 56720 | DEC 18 14 | 8.00 | | 27.5000 | 220.00 |
| | M110BX | | Mossy Oak Footwarmers  BOX | 8.00 | | | 220.00 |
| | | STYLE SUBTOTAL M110BX | | 8.00 | | | 220.00 |
| M111 | os | 54953 | OCT 2 14 | 72.00 | | 3.3800 | 243.36 |
| M111 | os | 55177 | OCT 17 14 | 1128.00 | | 3.1200 | 3,519.36 |
| M111 | os | 55298 | OCT 27 14 | 48.00 | | 3.3800 | 162.24 |
| M111 | os | 55344 | OCT 29 14 | 24.00 | | 3.2400 | 77.76 |
| M111 | os | 55425 | OCT 31 14 | 288.00 | 3.00 | 3.2400 | 905.13 |
| M111 | os | 55427 | OCT 31 14 | 72.00 | | 3.3800 | 243.36 |
| M111 | os | 55488 | NOV 5 14 | 144.00 | | 3.2400 | 466.56 |
| M111 | os | 55546 | NOV 7 14 | 72.00 | | 3.3800 | 243.36 |
| M111 | os | 55789 | NOV 17 14 | 72.00 | | 3.1200 | 224.64 |
| M111 | os | 55917 | NOV 19 14 | 96.00 | | 2.2300 | 214.08 |
| M111 | os | 55955 | NOV 21 14 | 144.00 | | 3.1200 | 449.28 |
| M111 | os | 56074 | NOV 21 14 | 48.00 | | 3.3800 | 162.24 |
| M111 | os | 56083 | NOV 24 14 | 48.00 | | 3.3800 | 162.24 |
| M111 | os | 56209 | NOV 28 14 | 48.00 | | 3.1200 | 149.76 |
| M111 | os | 56303 | DEC 3 14 | 24.00 | | 3.2400 | 77.76 |
| M111 | os | 56304 | DEC 3 14 | 12.00 | | 3.2400 | 38.88 |
| M111 | os | 56553 | DEC 11 14 | 48.00 | | 2.2300 | 107.04 |
| M111 | os | 56738 | DEC 18 14 | 12.00 | | 3.3800 | 40.56 |
| M111 | os | 56766 | DEC 19 14 | 72.00 | | 3.2080 | 230.98 |
| | M111 | | Mossy Oak Footwarmers  5 pk | 2,472.00 | | | 7,718.58 |
| | | STYLE SUBTOTAL M111 | | 2,472.00 | | | 7,718.58 |
| M202-SK | Lg/XL | 55682 | NOV 13 14 | 36.00 | | 10.6800 | 384.48 |
| M202-SK | Lg/XL | 55796 | NOV 17 14 | 7.00 | | 11.8500 | 82.95 |
| M202-SK | Lg/XL | 55916 | NOV 19 14 | 252.00 | | 10.5700 | 2,663.64 |
| M202-SK | Lg/XL | 56357 | DEC 4 14 | 12.00 | | 10.6800 | 128.16 |
| M202-SK | Lg/XL | 56362 | DEC 4 14 | 12.00 | | 10.6800 | 128.16 |
| M202-SK | Med/Lg | 56738 | DEC 18 14 | 6.00 | | 11.1300 | 66.78 |
| M202-SK | Lg/XL | 56738 | DEC 18 14 | 6.00 | | 11.1300 | 66.78 |
| M202-SK | Lg/XL | 56896 | DEC 30 14 | 12.00 | | 11.8000 | 141.60 |
| M202-SK | Med/Lg | 56939 | DEC 10 14 | 1.00 | | 10.0000 | 10.00 |
| M202-SK | Lg/XL | 56939 | DEC 10 14 | 2.00 | | 10.0000 | 20.00 |
| M202-SK | Med/Lg | 56940 | DEC 31 14 | 5.00 | | 10.0000 | 50.00 |
| | M202-SK | | Mossy OAk Heavy Wt Socks | 351.00 | | | 3,742.55 |
| | | STYLE SUBTOTAL M202 | | 351.00 | | | 3,742.55 |

| ITEM | SIZE | INVOICE | | QUANTITY | INV DISC % | PRICE | NET AMOUNT |
|---|---|---|---|---|---|---|---|
| M205-GRY-SK | Lg/XL | 55023 | OCT 9 14 | 72.00 | | 13.4700 | 969.84 |
| M205-GRY-SK | Lg/XL | 55344 | OCT 29 14 | 12.00 | | 12.9300 | 155.16 |
| M205-GRY-SK | Lg/XL | 55488 | NOV 5 14 | 36.00 | | 12.9300 | 465.48 |
| M205-GRY-SK | Lg/XL | 56355 | DEC 4 14 | 12.00 | | 15.5000 | 186.00 |
| M205-GRY-SK | Lg/XL | 56559 | DEC 11 14 | 6.00 | | 13.9500 | 83.70 |
| M205-GRY-SK | Lg/XL | 56720 | DEC 18 14 | 6.00 | | 13.9500 | 83.70 |
| M205-GRY-SK | Med/Lg | 56720 | DEC 18 14 | 6.00 | | 13.9500 | 83.70 |
| M205-GRY-SK | Lg/XL | 56779 | DEC 19 14 | 6.00 | | 15.0000 | 90.00 |

| | M205-GRY-SK | | Mossy Oak Acrylic Sock 2 pk | 156.00 | | | 2,117.58 |
|---|---|---|---|---|---|---|---|

| | STYLE SUBTOTAL M205 | | | 156.00 | | | 2,117.58 |
|---|---|---|---|---|---|---|---|

| M205 BULK-GRY-SK | Lg/XL | 56163 | NOV 26 14 | 36.00 | | 12.8000 | 460.80 |
| M205 BULK-GRY-SK | Lg/XL | 56303 | DEC 3 14 | 12.00 | | 12.9300 | 155.16 |
| M205 BULK-GRY-SK | Lg/XL | 56304 | DEC 3 14 | 12.00 | | 12.9300 | 155.16 |

| | M205 BULK-GRY-SK | | Mossy Oak Acrylic Sock Bulk | 60.00 | | | 771.12 |
|---|---|---|---|---|---|---|---|

| | STYLE SUBTOTAL M205 BULK | | | 60.00 | | | 771.12 |
|---|---|---|---|---|---|---|---|

| M206-O-SK | Lg/XL | 54953 | OCT 2 14 | 12.00 | | 11.0200 | 132.24 |
| M206-O-SK | Lg/XL | 55298 | OCT 27 14 | 24.00 | | 11.0200 | 264.48 |
| M206-O-SK | Med/Lg | 55298 | OCT 27 14 | 12.00 | | 11.0200 | 132.24 |
| M206-O-SK | Lg/XL | 55329 | OCT 29 14 | 12.00 | | 11.8000 | 141.60 |
| M206-O-SK | Lg/XL | 55488 | NOV 5 14 | 36.00 | | 11.0200 | 396.72 |
| M206-O-SK | Med/Lg | 55798 | NOV 17 14 | 36.00 | | 10.4740 | 377.06 |
| M206-O-SK | Lg/XL | 55916 | NOV 19 14 | 192.00 | | 10.4700 | 2,010.24 |
| M206-O-SK | Lg/XL | 56303 | DEC 3 14 | 12.00 | | 10.5800 | 126.96 |
| M206-O-SK | Lg/XL | 56304 | DEC 3 14 | 12.00 | | 10.5800 | 126.96 |
| M206-O-SK | Med/Lg | 56692 | DEC 17 14 | 12.00 | | 11.8000 | 141.60 |
| M206-O-SK | Med/Lg | 56831 | DEC 23 14 | -36.00 | | 10.4740 | -377.06 |
| M206-O-SK | Lg/XL | 56896 | DEC 30 14 | 12.00 | | 11.8000 | 141.60 |

| | M206-O-SK | | Mossy Oak Mid Calf Sock | 336.00 | | | 3,614.64 |
|---|---|---|---|---|---|---|---|

| | STYLE SUBTOTAL M206 | | | 336.00 | | | 3,614.64 |
|---|---|---|---|---|---|---|---|

| M250 | OS | 55293 | OCT 27 14 | 240.00 | | 7.1000 | 1,704.00 |
| M250 | OS | 55526 | NOV 7 14 | 456.00 | | 7.7200 | 3,520.32 |
| M250 | OS | 55531 | NOV 7 14 | 12.00 | | 8.1300 | 97.56 |
| M250 | OS | 55533 | NOV 7 14 | 72.00 | 5.00 | 8.1300 | 556.09 |
| M250 | OS | 55534 | NOV 7 14 | 72.00 | | 8.1300 | 585.36 |
| M250 | OS | 55535 | NOV 7 14 | 24.00 | | 8.1300 | 195.12 |
| M250 | OS | 55536 | NOV 7 14 | 24.00 | | 7.0290 | 168.70 |
| M250 | OS | 55544 | NOV 7 14 | 36.00 | | 7.8100 | 281.16 |
| M250 | OS | 55545 | NOV 7 14 | 36.00 | | 7.8100 | 281.16 |
| M250 | OS | 55546 | NOV 7 14 | 36.00 | | 8.1300 | 292.68 |
| M250 | OS | 55547 | NOV 7 14 | 48.00 | | 7.8100 | 374.88 |
| M250 | OS | 55548 | NOV 7 14 | 36.00 | | 7.8100 | 281.16 |
| M250 | OS | 55553 | NOV 10 14 | 624.00 | | 7.1000 | 4,430.40 |
| M250 | OS | 55586 | NOV 10 14 | 12.00 | | 8.9500 | 107.40 |
| M250 | OS | 55708 | NOV 13 14 | 12.00 | | 8.2500 | 99.00 |
| M250 | OS | 55709 | NOV 13 14 | 12.00 | | 8.2500 | 99.00 |

| ITEM | SIZE | INVOICE | | QUANTITY | INV DISC % | PRICE | NET AMOUNT |
|---|---|---|---|---|---|---|---|
| M250 | os | 55756 | NOV 14 14 | 24.00 | | 8.1300 | 195.12 |
| M250 | os | 55796 | NOV 17 14 | 7.00 | | 9.8500 | 68.95 |
| M250 | os | 55916 | NOV 19 14 | 576.00 | | 7.7200 | 4,446.72 |
| | M250 | | Mossy OakFlat Footbed Men's | 2,359.00 | | | 17,784.78 |
| | STYLE SUBTOTAL M250 | | | 2,359.00 | | | 17,784.78 |
| M251 | os | 55293 | OCT 27 14 | 240.00 | | 7.1000 | 1,704.00 |
| M251 | os | 55329 | OCT 29 14 | 12.00 | | 8.2500 | 99.00 |
| M251 | os | 55535 | NOV 7 14 | 12.00 | | 8.1300 | 97.56 |
| M251 | os | 55546 | NOV 7 14 | 24.00 | | 8.1300 | 195.12 |
| M251 | os | 55553 | NOV 10 14 | 408.00 | | 7.1000 | 2,896.80 |
| M251 | os | 56090 | NOV 24 14 | 72.00 | | 7.1000 | 511.20 |
| M251 | os | 56185 | NOV 28 14 | 12.00 | | 8.2500 | 99.00 |
| | M251 | | Mossy OakFlat Footbed Ladies | 780.00 | | | 5,602.68 |
| | STYLE SUBTOTAL M251 | | | 780.00 | | | 5,602.68 |
| M353 | os | 54974 | OCT 3 14 | 80.00 | | 0.4400 | 35.20 |
| M353 | os | 55018 | OCT 8 14 | 320.00 | | 0.4500 | 144.00 |
| M353 | os | 55023 | OCT 9 14 | 320.00 | | 0.4400 | 140.80 |
| M353 | os | 55145 | OCT 15 14 | 8.00 | | 18.4500 | 147.60 |
| M353 | os | 55282 | OCT 27 14 | 1280.00 | | 0.4400 | 563.20 |
| M353 | os | 55298 | OCT 27 14 | 80.00 | | 0.4400 | 35.20 |
| M353 | os | 55606 | NOV 10 14 | 15000.00 | | 0.2200 | 3,300.00 |
| M353 | os | 55653 | NOV 12 14 | 320.00 | | 0.4400 | 140.80 |
| M353 | os | 55752 | NOV 13 14 | 3840.00 | | 0.3500 | 1,344.00 |
| M353 | os | 55796 | NOV 17 14 | 160.00 | | 0.7300 | 116.80 |
| M353 | os | 55913 | NOV 19 14 | 80.00 | | 0.4400 | 35.20 |
| M353 | os | 55917 | NOV 19 14 | 4480.00 | | 0.3500 | 1,568.00 |
| M353 | os | 55980 | NOV 19 14 | 640.00 | | 0.3500 | 224.00 |
| M353 | os | 56069 | NOV 22 14 | 320.00 | | 0.3500 | 112.00 |
| M353 | os | 56070 | NOV 22 14 | 320.00 | | 0.3500 | 112.00 |
| M353 | os | 56071 | NOV 22 14 | 640.00 | | 0.3500 | 224.00 |
| M353 | os | 56073 | NOV 22 14 | 320.00 | | 0.3500 | 112.00 |
| M353 | os | 56074 | NOV 21 14 | 960.00 | | 0.3500 | 336.00 |
| M353 | os | 56079 | NOV 21 14 | 960.00 | | 0.3500 | 336.00 |
| M353 | os | 56080 | NOV 24 14 | 320.00 | | 0.3500 | 112.00 |
| M353 | os | 56081 | NOV 24 14 | 320.00 | | 0.3500 | 112.00 |
| M353 | os | 56082 | NOV 24 14 | 960.00 | | 0.3500 | 336.00 |
| M353 | os | 56083 | NOV 24 14 | 320.00 | | 0.3500 | 112.00 |
| M353 | os | 56085 | NOV 24 14 | 640.00 | | 0.3500 | 224.00 |
| M353 | os | 56201 | NOV 28 14 | 320.00 | | 0.4400 | 140.80 |
| M353 | os | 56334 | DEC 3 14 | 200.00 | | 0.4400 | 88.00 |
| M353 | os | 56410 | DEC 5 14 | 320.00 | | 0.4400 | 140.80 |
| M353 | os | 56444 | DEC 8 14 | 80.00 | | 0.4400 | 35.20 |
| M353 | os | 56603 | DEC 12 14 | 320.00 | | 0.4400 | 140.80 |
| M353 | os | 56680 | DEC 11 14 | 3840.00 | | 0.3500 | 1,344.00 |
| M353 | os | 56782 | DEC 22 14 | 120000.00 | | 0.2700 | 32,400.00 |
| M353 | os | 56943 | DEC 1 14 | 40.00 | | 0.3300 | 13.20 |
| M353 | os | 57004 | DEC 1 14 | 280.00 | | 0.3300 | 92.40 |
| | M353 | | Mossy Oak Mini Size Warmers | 158,088.00 | | | 44,318.00 |

| ITEM | SIZE | INVOICE | | QUANTITY | INV DISC % | PRICE | NET AMOUNT |
|------|------|---------|---|----------|-----------|-------|------------|
| | | STYLE SUBTOTAL M353 | | 158,088.00 | | | 44,318.00 |
| M353BX | OS | 54935 | OCT 1 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | OS | 55228 | OCT 22 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | OS | 55234 | OCT 22 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | OS | 55236 | OCT 22 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | OS | 55237 | OCT 22 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | OS | 55245 | OCT 22 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | OS | 56015 | NOV 21 14 | 16.00 | | 18.4500 | 295.20 |
| M353BX | OS | 56213 | DEC 1 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | OS | 56223 | DEC 1 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | OS | 56310 | DEC 3 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | OS | 56344 | DEC 4 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | OS | 56348 | DEC 4 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | OS | 56423 | DEC 8 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | OS | 56448 | DEC 8 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | OS | 56545 | DEC 11 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | OS | 56719 | DEC 18 14 | 8.00 | | 18.4500 | 147.60 |
| M353BX | | Mossy Oak Mini Size Warmers Box 40 pa | | 166.00 | | | 2,509.20 |
| | | STYLE SUBTOTAL M353BX | | 136.00 | | | 2,509.20 |
| | | TOTAL | | 185,076.00 | | | 88,603.23 |

Print sideways to Show Customer

# APPENDIX E

See attached Confidentiality Terms and Conditions which are incorporated herein by reference

_____          _____
Purchaser          Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

# APPENDIX  E

See attached Confidentiality Terms and Conditions which are incorporated herein by reference

_____   _____
Purchaser        Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

## CONFIDENTIALITY TERMS AND CONDITIONS

1.     Definition of Confidential Information.  "Confidential Information" shall mean any information, including but not limited to data, techniques, protocols or results, or business, financial, commercial or technical information, disclosed by one Party (each a "Discloser" as applicable) to the other Party (each a "Recipient" as applicable) and identified as confidential at the time of disclosure (the "Purpose"). Licensor's Confidential Information shall also include all information disclosed by Licensor to Licensee in connection with the Patent Rights that was not general known to the public or to other persons and that was the subject of efforts are reasonably under the circumstances to maintain its secrecy.  Capitalized terms used in this Appendix that are not otherwise defined herein have the meanings ascribed in the Agreement to which this Appendix is attached and made a part thereof.

2.     Exclusions.  "Confidential Information" under this Agreement shall not include any information that (i) is or becomes publicly available through no wrongful act of Recipient; (ii) was known by Recipient prior to disclosure by Discloser, as evidenced by tangible records; (iii) becomes known to Recipient after disclosure from a third party having an apparent bona fide right to disclose it; (iv) is independently developed or discovered by Recipient without use of Discloser's Confidential Information, as evidenced by tangible records; or (v) is disclosed to another party by Discloser without restriction on further disclosure.  The obligations of confidentiality and non-use set forth in this Agreement shall not apply with respect to any information that Recipient is required to disclose or produce pursuant to applicable law, court order or other valid legal process provided that Recipient promptly notifies Discloser prior to such required disclosure, discloses such information only to the extent so required and cooperates reasonably with Discloser's efforts to contest or limit the scope of such disclosure.

3.     Permitted Purpose.  Recipient shall have the right to, and agrees that it will, use Discloser's Confidential Information solely for the Purpose as described in the Agreement, except as may be otherwise specified in a separate definitive written agreement negotiated and executed between the parties.

4.     Restrictions.  For the term of the Agreement and a period of three (3) years thereafter (and indefinitely with respect to any individually identifiable health information disclosed by Licensor to Licensee, if any), each Recipient agrees that: (i) it will not use such Confidential Information for any purpose other than as specified herein, including without limitation for its own benefit or the benefit of any other person or entity; and (ii) it will use reasonable efforts (but no less than the efforts used to protect its own confidential and/or proprietary information of a similar nature) not to disclose such Confidential Information to any other person or entity except as expressly permitted hereunder.  Recipient may, however, disclose Discloser's Confidential Information only on a need-to-know basis to its and its Affiliates employees, staff members and agents ("Receiving Individuals") who are directly participating in the Purpose and who are informed of the confidential nature of such information, provided Recipient shall be responsible for compliance by Receiving Individuals with the terms of this Agreement and any breach thereof.  Each party further agrees not to use the name of the other party or any of its Affiliates or any of their respective trustees, directors, officers, staff members, employees, students or agents in any advertising, promotional or sales literature, publicity or in any document employed to obtain funds or financing without the prior written approval of the party or individual whose name is to be used, in the case of Licensor such approval to be given by the Public Affairs Department.  This Section 4 shall survive termination or expiration of this Agreement.

5.     Ownership.  All Confidential Information disclosed pursuant to this Agreement, including without limitation all written and tangible forms thereof, shall be and remain the property of the Discloser.  Upon termination of this Agreement, if requested by Discloser, Recipient shall return or destroy at Discloser's discretion all of Discloser's Confidential Information, provided that Recipient shall be entitled to keep one copy of such Confidential Information in a secure location solely for the purpose of determining Recipient's legal obligations hereunder.

6.      No License. Nothing in this Agreement shall be construed as granting or conferring, expressly or impliedly, any rights by license or otherwise, under any patent, copyright, or other intellectual property rights owned or controlled by Discloser relating to Confidential Information, except as specifically set forth in that certain Patent Licensing Agreement dated July  18  , 2017 ("Agreement").

7.      Remedies. Each party acknowledges that any breach of the Confidentiality Terms and Conditions by it may cause irreparable harm to the other party and that each party is entitled to seek injunctive relief and any other remedy available at law or in equity.

8.      General. These Confidentiality Terms and Conditions, along with the Agreement, contain the entire understanding of the parties with respect to the subject matter hereof, and supersede any prior oral or written understandings between the parties relating to confidential treatment of information. These Confidentiality Terms and Conditions shall survive any expiration or termination of this Agreement.


Heat Factory, USA, Inc.                          Schawbel Technologies LLC


By: _____                     By: _____
Name:  David Treptow   7-18-17                    Name:
Title: President                                  Title:

6.     No License.  Nothing in this Agreement shall be construed as granting or conferring, expressly or impliedly, any rights by license or otherwise, under any patent, copyright, or other intellectual property rights owned or controlled by Discloser relating to Confidential Information, except as specifically set forth in that certain Patent Licensing Agreement dated July  18  , 2017 ("Agreement").

7.     Remedies.  Each party acknowledges that any breach of the Confidentiality Terms and Conditions by it may cause irreparable harm to the other party and that each party is entitled to seek injunctive relief and any other remedy available at law or in equity.

8.     General.  These Confidentiality Terms and Conditions, along with the Agreement, contain the entire understanding of the parties with respect to the subject matter hereof, and supersede any prior oral or written understandings between the parties relating to confidential treatment of information.  These Confidentiality Terms and Conditions shall survive any expiration or termination of this Agreement.

Heat Factory, USA, Inc.                          Schawbel Technologies LLC

By: _____           By: _____
Name:  David Treptow                          Name:
Title: President                                      Title:   C : C . O

## EXHIBIT 8.1(a)
## PATENT ASSIGNMENTS

See attached list which is incorporated herein by reference

Purchaser          Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

**EXHIBIT 8.1(a)**

**PATENT ASSIGNMENTS**

See attached list which is incorporated herein by reference

Exhibits to Heat Factory, USA, Inc. /Schawbel Technologies, LLC. Exclusive Patent Licensing Agreement

_____     _____
Purchaser                                    Seller

This is a disclosure schedule to the Exclusive Patent Licensing Agreement ("Agreement"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Agreement, and unless the context requires otherwise, references to sections are references to sections of the Agreement. Any information disclosed in this disclosure schedule may relate to and qualify disclosures made under one or more other disclosure schedules.

## 转 让 证 明

我/我们（转让人），中国发明专利申请＿＿＿＿＿＿＿＿＿＿（基于国际申请 PCT/US2012/071797、国际申请日 2012 年 12 月 27 日）的申请人，现将此专利申请的所有权益于＿＿＿年＿＿月＿＿日转让给下面列出的受让人：

受让人名称：＿＿＿＿＿肖贝尔科技有限责任公司＿＿＿＿＿
地址：＿＿＿＿＿美国 马萨诸塞州＿＿＿＿＿＿
签字日期：＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

转让人名称：＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
地址：＿＿＿＿＿美国 马萨诸塞州＿＿＿＿＿＿
签字日期：＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

### Assignment

I/we (Assignor(s)), the owner(s) of the Chinese application＿＿＿＿＿＿＿

(based on international application PCT/US2012/071797 which filed on (day)27 (month)

12 (year) 2012 ), hereby assign, on (day)＿＿(month)＿＿(year)＿＿, all my/our rights

and interests in the said invention application to the Assignee(s) as follows:

Assignee:＿＿＿＿＿＿＿＿SCHAWBEL TECHNOLOGIES LLC＿＿＿＿＿＿＿

Address:＿＿＿＿＿＿＿＿＿＿＿Massachusetts, USA＿＿＿＿＿＿＿＿＿

Seal or Signature:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

Date:＿＿＿＿＿＿＿＿August  20.  2014＿＿＿＿＿＿＿＿＿

Assignor:＿＿＿＿＿＿＿＿THE SCHAWBEL CORPORATION＿＿＿＿＿＿＿

Address:＿＿＿＿＿＿＿＿＿＿Massachusetts, USA＿＿＿＿＿＿＿＿＿

Seal or Signature:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

Date:＿＿＿＿＿＿＿＿8/20/14＿＿＿＿＿＿＿＿＿

# 转 让 证 明

我/我们（转让人），中国发明专利申请＿＿＿＿＿＿＿＿＿＿＿＿（基于国际申请 PCT/US2012/023986、国际申请日 2012 年 2 月 6 日）的申请人，现将此专利申请的所有权益于＿＿＿＿年＿＿月＿＿日转让给下面列出的受让人：

受让人名称：＿＿＿＿＿肖贝尔科技有限责任公司＿＿＿＿＿＿＿

地址：＿＿＿＿＿＿＿美国 马萨诸塞州＿＿＿＿＿＿＿

转让人名称：＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

地址：＿＿＿＿＿＿美国 马萨诸塞州＿＿＿＿＿＿＿

## Assignment

I/we (Assignor(s)), the owner(s) of the Chinese application＿＿＿＿＿＿＿

(based on international application PCT/US2012/023986 which filed on (day)6 (month) 2 (year) 2012 ), hereby assign, on (day)＿＿(month)＿＿(year)＿＿＿, all my/our rights and interests in the said invention application to the Assignee(s) as follows:

Assignee:＿＿＿＿＿＿＿＿＿＿SCHAWBEL TECHNOLOGIES LLC＿＿＿＿＿

Address:＿＿＿＿＿＿＿＿＿＿Massachusetts, USA＿＿＿＿＿＿

Seal or Signature:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

Date:＿＿＿＿＿＿＿＿＿＿August 20, 2014＿＿＿＿

Assignor:＿＿＿＿＿＿＿＿＿＿THE SCHAWBEL CORPORATION＿＿＿＿

Address:＿＿＿＿＿＿＿＿＿＿Massachusetts, USA＿＿＿＿＿＿

Seal or Signature:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

Date:＿＿＿＿＿＿＿＿＿＿8/20/14＿＿＿＿＿